RMT/DMP:SK/DKK/JMH
F.#2011R00298

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
– – – – – – – – – – – – – – – – – X

UNITED STATES OF AMERICA

    - against -                Criminal Docket No. 17-449 (NGG)

MIRSAD KANDIC,

          Defendant.

– – – – – – – – – – – – – – – – – X

## THE GOVERNMENT'S RESPONSE IN OPPOSITION
## TO THE DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

RICHARD P. DONOGHUE
United States Attorney
Eastern District of New York

Saritha Komatireddy
David K. Kessler
J. Matthew Haggans
Assistant U.S. Attorneys
(Of Counsel)

TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND ........................................................................................................................2

I.       The Defendant's Provision of Material Support to ISIS.....................................................2

II.      The Defendant's Arrest and Extradition ...........................................................................3

III.     The Challenged Statements...............................................................................................4

         A.       The Defendant's March 27, 2012 Statements.......................................................... 4

         B.       The Defendant's July 18, 2012 Statements........................................................... 6

         C.       The Defendant's July 25-26, 2017 Statements ..................................................... 8

ARGUMENT .............................................................................................................................14

I.       The Defendant's Motion Does Not Require an Evidentiary
         Hearing.........................................................................................................................14

II.      The Defendant's Statements Were Legally Obtained and
         Should Not Be Suppressed..............................................................................................15

         A.       Legal Standards.................................................................................................. 15

         B.       Discussion .......................................................................................................... 17

CONCLUSION..........................................................................................................................25

TABLE OF AUTHORITIES

CASES

Acosta v. Artuz, 575 F.3d 177 (2d Cir. 1991) ...................................................... 24

Berkemer v. McCarty, 468 U.S. 420 (1984)......................................................... 16

California v. Beheler, 463 U.S. 1121 (1983) ........................................................ 15

California v. Prysock, 453 U.S. 355 (1981).......................................................... 17

Campaneria v. Reid, 891 F.2d 1014 (2d Cir. 1989)............................................. 24

Cruz v. Miller, 255 F.3d 77 (2d Cir. 2001)........................................................... 17

Easley v. Frey, 433 F.3d 969 (7th Cir. 2006) ....................................................... 24

Georgison v. Donelli, 588 F.3d 145 (2d Cir. 2009).............................................. 23

Howes v. Fields, 565 U.S. 499 (2012)............................................................ 15, 23

Maryland v. Shatzer, 559 U.S. 98 (2010) ............................................................ 17

Miranda v. Arizona, 384 U.S. 436 (1966)……………………………………… passim

Rhode Island v. Innis, 446 U.S. 291 (1980).......................................................... 16

Stansbury v. California, 511 U.S. 318 (1994) (per curiam)................................... 16

Tabbaa v. Chertoff, 509 F.3d 89 (2d Cir. 2007) .................................................. 21

Tankleff v. Senkowski, 135 F.3d 235 (2d Cir. 1998) ............................................ 18

United States v. Ali, 68 F.3d 1468 (2d Cir. 1995), on reh'g, 86 F.3d 275 (2d Cir. 1996)........... 22

United States v. Aparo, 221 F. Supp. 2d 359 (E.D.N.Y. 2002)............................. 18

United States v. Flores-Sandoval, 474 F.3d 1142 (8th Cir. 2007).......................... 18

United States v. FNU LNU, 653 F.3d 144 (2d Cir. 2011)..................................... passim

United States v. Gillette, 383 F.2d 843 (2d Cir. 1967) ......................................... 14

United States v. Guido, 704 F.2d 675 (2d Cir. 1983) ........................................... 24

United States v. Kirsteins, 996 F.2d 919 (2d Cir. 1990)........................................ 16

United States v. Larranga Lopez, No. 05-CR-655, 2006 WL 1307963 (E.D.N.Y. May 11, 2006)
     .................................................................................................................. 14

United States v. McDow, 206 F. Supp. 3d 829 (S.D.N.Y. 2016)........................... 18

United States v. Miller, 116 F.3d 641 (2d Cir. 1997) ........................................... 24

United States v. Newton, 181 F. Supp. 2d 157 (E.D.N.Y. 2002) ..................... 15, 16

United States v. Reyes, No. 11-CR-58, 2012 WL 363042 (S.D.N.Y. Feb. 1, 2012)................... 18

United States v. Silva, 715 F.2d 43 (2d Cir. 1983)............................................... 20

United States v. Soto, No. 13-CR-76, 2014 WL 3695990 (E.D.N.Y. July 24, 2014) ................. 20

United States v. Stroman, 420 F. App'x 100 (2d Cir. 2012) ................................. 24

United States v. Uribe-Velasco, 930 F.2d 1029 (2d Cir. 1991)....................................... 22

United States v. Velentzas, No. 15-CR-213, 2019 WL 3252961 (E.D.N.Y. July 16, 2019).. 21, 22

United States v. Viscioso, 711 F. Supp. 740 (S.D.N.Y. 1989) ................................. 14, 15

United States v. Wong Ching Hing, 867 F.2d 754 (2d Cir. 1989)................................ 17

United States v. Wyatt, 179 F.3d 532 (7th Cir. 1999) ................................................. 18

United States v. Zygmont, No. 12-CR-152, 2013 WL 3246139 (D.Vt. June 26, 2013) ............. 23

## STATUTES

18 U.S.C. § 2339B(a)(1) ............................................................................................ 4

## RULES

Fed. R. Evid. 410(b)(1) ............................................................................................. 13

PRELIMINARY STATEMENT

The defendant Mirsad Kandic has been charged by indictment with six federal terrorism offenses, two of which carry statutory maximum sentences of life imprisonment. The charged offenses arise from the defendant conspiring to provide and providing a wide range of material support and resources to the Islamic State of Iraq and al-Sham ("ISIS") from approximately 2013 to 2017, during which time the defendant was located in Syria and Turkey.

On September 6, 2019, the defense moved to suppress statements that the defendant made to law enforcement officers on four separate occasions over the span of more than five years. The defense argues that, because the statements were not preceded by formal <u>Miranda</u> warnings, they are inadmissible. However, that argument ignores the specific contexts in which each of the statements was made. On each occasion, the defendant made voluntary statements in a non-custodial setting. In these circumstances, <u>Miranda</u> was not required and the statements are admissible.

For the reasons set forth below, the government respectfully submits that the defense's motion should be denied. Furthermore, because the defendant does not dispute any of the facts relevant to the motion, the motion should be denied without an evidentiary hearing.

1

<u>BACKGROUND</u>

This case arose from an investigation by the Federal Bureau of Investigation's New York Joint Terrorism Task Force ("FBI" and "JTTF," respectively).

The defendant was a Lawful Permanent Resident of the United States and a former resident of the Bronx and Brooklyn, New York.  Beginning in approximately 2005, the defendant expressed his desire to travel to Pakistan, Afghanistan and locations in the Middle East to engage in jihad against U.S. military forces and to seek his own martyrdom.  By late 2013, the defendant began trying to realize those objectives.  Having learned that he may have been on the No-Fly List, the defendant chose to depart the United States by a circuitous route, traveling across the border to Mexico and then by plane to Panama, Brazil, and ultimately Turkey.  From there, he went to Syria and joined ISIS.

I.    <u>The Defendant's Provision of Material Support to ISIS</u>

The defendant initially "worked in [the] media department" of ISIS, as he later told an associate.  The defendant operated numerous Twitter accounts to disseminate ISIS propaganda, exhort individuals in the United States and elsewhere to take action in support of ISIS, and publicize attacks against the West.   For example, hours after the November 2015 shootings and suicide bombings in Paris, France, the defendant posted a Twitter message stating: "America in fear.!  The NYPD have said they will have more officers on the streets in response to the terrorist attacks in Paris this evening."  On December 27, 2015, the defendant used one of his Twitter accounts to promote the May 2015 shooting in Garland, Texas, at an exhibition featuring cartoons of the Prophet Mohammed, posting: "City of #garland in Texas, USA, where they insulted the Prophet of Islam last year.  May they perish and suffer more:[.]"  The defendant operated his Twitter accounts under monikers designed to conceal his true identity.

The defendant then worked as an ISIS recruiter and travel facilitator based in Turkey, principally by assisting non-Syrian or -Iraqi individuals ("foreign fighters") to travel to the Middle East to join ISIS in Syria, and by further assisting them to leave Syria and enter Europe. In a recorded audio message from the defendant to an associate, the defendant claimed, "I sent out over 20,000 brothers . . . to Sham," and "I have a lot of Mujahideen in Europe, a lot."[1]   The defendant also provided false documentation and identification to ISIS foreign fighters, and obtained property and equipment useful for ISIS's activities.

Among the foreign fighters the defendant facilitated was Australian Jake Bilardi. In August 2014, the defendant helped Bilardi travel from Melbourne, Australia to Istanbul, Turkey, and onward into ISIS-controlled territory in Syria and Iraq.   Through Twitter messages, the defendant gave Bilardi instructions on what to do when Bilardi arrived in Turkey and advice about items he would not be able to bring with him into ISIS-controlled territory.   The defendant continued to communicate with Bilardi as he trained and fought with ISIS, and encouraged Bilardi to commit violent attacks, including suicide attacks, instructing Bilardi to "Level these kufar [non-believers] with the ground in shaAllah" and explaining that the "kufars" should experience "a shock wave if the bullets and shrapnells [sic] can't reach them So there [sic] lungs and heart's [sic] implode."   Bilardi subsequently carried out a suicide truck bombing in the vicinity of Ramadi, Iraq, in March 2015.

II.     The Defendant's Arrest and Extradition

In January 2017, the defendant relocated to Bosnia.   On June 30, 2017, Bosnian authorities arrested him in Sarajevo.   At the time of his arrest, the defendant possessed false

---

[1] "Sham" is frequently used by ISIS members to refer to the region of the Levant, which includes Syria, and "Mujahideen" refers to fighters.

identification documents that he had used to enter the country.   Bosnian authorities initially detained the defendant on immigration charges and subsequently detained him pursuant to an Interpol Red Notice based on terrorism charges set forth in a (then-sealed) affidavit in support of arrest that had been issued in the Eastern District of New York.   See ECF No. 1.

On August 17, 2017, a grand jury in the Eastern District of New York returned an indictment charging the defendant with six violations of 18 U.S.C. § 2339B(a)(1), for conspiring to provide, providing and attempting to provide material support and resources to ISIS.   Counts One and Five carry a statutory maximum of life imprisonment; the remaining counts carry a statutory maximum of 20 years' imprisonment.   Following extradition proceedings, the defendant arrived in the Eastern District of New York on October 31, 2017.

III.     The Challenged Statements

On four relevant occasions over the course of more than five years, the defendant made statements to law enforcement officers, during which he described his personal background and variously denied and admitted to being involved with radical Islamic extremism.   The defense now moves to suppress the statements described below.   The facts set forth below are drawn from FBI reports documenting the relevant encounters and other portions of discovery appended to this response.   In support of the defendant's motion to suppress, defense counsel submitted a declaration stating that the factual support for the motion derives from the government's discovery, including FBI reports summarizing the defendant's statements, and did not dispute or deny any of the facts set forth in the referenced FBI reports or discovery.   Accordingly, the following facts are undisputed:

A.     The Defendant's March 27, 2012 Statements

On March 27, 2012, two JTTF agents interviewed the defendant outside the Avenue H Subway station in Brooklyn, New York.   Ex. B at 1.   The defendant was familiar with the JTTF

4

at this time because he had previously spoken with JTTF officers—including one of the interviewing agents— and retained their contact information. Ex. B at 2 (defendant "stated he still has names/numbers for task force officers who spoke to him a couple years ago"); compare Ex. A with Ex. B (same interviewing agent).

Most of the interview focused on individuals with whom the defendant associated and whether he knew anyone with extremist views.  During the course of the conversation, the defendant also discussed his personal history.  Ultimately, the defendant declined to become an informant for the JTTF officers but assured the agents that he would call if he had any specific threat information. Ex. B at 1-2 (defendant stated that he "still has names/numbers for task force officers who spoke to him a couple years ago but has no interest in establishing any sort of ongoing communications with law enforcement"; and stated that "he would not like to have any sort of relationship with law enforcement, but would certainly call law enforcement if he became aware of any type of threat, here or abroad").

The government expects to introduce at trial various parts of the foregoing conversation, including that: the defendant provided his home address and cellular telephone number (which matches the registration information for some of his online accounts); the defendant discussed the identities and locations of his family members, the mosques he attended, the languages he speaks, and the jobs he held (which corroborates witness testimony and online communications); the defendant noted the banks and wire services he used (which corroborates financial documents and records); the defendant denied that he had ever been in the military either in the United States or overseas (later shown to be false); the defendant denied having any extremist views or ideology, denied associating with anyone with extremist views, explained that individuals with those type of views do not spend time around him or his friends because they

5

know their views are not accepted, and denied knowing anyone who had ever been arrested for terrorism (also false); the defendant admitted that he had heard of individuals overseas who had been arrested for terrorism; and the defendant refused to provide any specific information about people or websites espousing extremist views.  Ex. B at 1-2.

> B.      The Defendant's July 18, 2012 Statements

On July 18, 2012, the defendant attempted to depart John F. Kennedy International Airport to travel to Pristina, Kosovo.  Ex. C at 1.  A uniformed officer with the Port Authority Police Department notified the defendant that he would not be permitted to depart.  Ex. C at 1. The defendant provided various forms of identification.  He was then escorted to meet two JTTF agents, who interviewed the defendant.  Ex. C at 1.  The defendant was familiar with one of the interviewing agents because she had interviewed him on at least two prior occasions.  Compare Ex. A with Ex. B and Ex. C (same interviewing agent).

Most of the interview focused on the defendant's "No-Fly" status.  The defendant was informed, at the outset, that he had been placed on the No-Fly List because of allegations that he had made "statements in support of extremism and jihad" and because law enforcement officers had information that the defendant had previously been involved in foreign military service.  Ex. C at 1.  The defendant was also advised, at the outset, that "it was necessary [to] be truthful and that lying to the FBI conducting an investigation is a felony."  Ex. C at 1.

The defendant then proceeded to discuss his prior foreign military service, the purpose of his trip to Kosovo, his employment, and his lack of any extremist/terrorist views.  Ex. C at 1-2.  The defendant was "upset that he was not being allowed to fly because of something that was said about him" and provided the agents with three character references.  Ex. C at 2.  The defendant also discussed his communications methods, internet usage, overseas wire transfers, and associates.  Ex. C at 2-3.

The defendant then stated that "he did not understand why he was not able to fly because the person who said things about him should have to provide some kind of proof," and "asked how long" it would take to resolve the allegations that he supported jihad or extremism "and why we couldn't just call the people whose names he provided so he could fly today." Ex. C at 4. After learning that the process would take more time, the defendant asked about obtaining a refund for his airline ticket. Ex. C at 4. He also made statements about who had given him a ride to the airport and the travel agency he used to purchase his ticket. Ex. C at 4-5.

The government expects to introduce at trial various parts of the foregoing conversation, including that: the defendant provided his cellular telephone number (same as before), Kosovo passport (which listed his place of birth), New York State driver's license (which listed his home address), social security card, Permanent Resident card, and airline ticket purchase information (all of which match biographical information mentioned in online communications); the defendant admitted that he had previously registered with an organization related to the Kosovo Liberation Army (which contradicts earlier statements); the defendant admitted that when he initially fled from Kosovo to the United States he used false identification to enter the United States (which shows his facility with false identification); the defendant discussed the identities of his roommate, brother, a close friend, and the individual that accompanied him to the airport (which corroborates witness testimony and online communications); the defendant denied having any email accounts or any time for the internet or email (which was false); the defendant then admitted that he used to have an email account but it expired after 30 days (also false); the defendant provided an incorrect username for his email account; the defendant denied having any extremist views, watching extremist content online, or knowing any specific extremists; the defendant stated that he did not recognize the photographs of a number of known terrorism

7

defendants but did recognize several individuals who he considered to be "not radical or extreme" or not knowledgeable or respected; the defendant admitted that he used the internet to search YouTube for religious sermons; the defendant admitted that he used Skype to take Arabic language lessons from an individual located in Pakistan but claimed that he could not recall his Skype username; the defendant admitted to using wire transfer services to send money overseas but could not recall the name of one of the overseas recipients; and the defendant was upset that he was not being allowed to fly, asked how long it would take to resolve the issues preventing him from flying, and asked if he could fly later the same day.

     C.     <u>The Defendant's July 25-26, 2017 Statements</u>

On June 30, 2017, Bosnian authorities arrested the defendant in Sarajevo. At the time of his arrest, the defendant possessed false identification documents that he had used to enter the country. Bosnian authorities initially detained the defendant on immigration charges and subsequently detained him pursuant to an Interpol Red Notice based on terrorism charges issued in the Eastern District of New York. Ex. D at 3. After his arrest, foreign authorities arraigned the defendant and provided him with a defense attorney from Bosnia.

On July 11, 2017, foreign authorities brought the defendant to the Prosecutor's Office of Bosnia and Herzegovina. Ex. D at 1. In the presence of the defense attorney, foreign authorities—including a prosecutor and expert advisor—informed the defendant of the charges against him in Bosnia and the United States and advised the defendant of his rights, including:

- the "right to defend yourself personally or with the professional help of a lawyer";

- "the right to be given sufficient time to prepare for your defense";

- "You do not have to defend yourself or answer any of the questions you are asked";

8

- "You can hire a defense attorney of your choice and he/she may be present at your hearing";

- "You are entitled to use a defense attorney at no cost to you in certain cases";

- "You can give a statement on the offense you are charged with, and state all the facts and proofs, which are beneficial to you, and if you do so in the presence of your defense attorney, any statement of yours can be used as evidence at your trial and can be read and used during the trial without your consent";

- "During the investigation, you have the right to go through the documents and evidence obtained for items which are in your favor, except for those documents and evidence/items whose disclosure would compromise the objective of the investigation";

- "If you waive your right to a defense attorney, and later wish to hire a defense attorney, the questioning shall be stopped and continued once again once you get an attorney or once one is assigned to you"; and

- "If you decide to answer the questions that are asked, you shall be allowed to state all the facts and proofs which are in your favor."

Ex. D at 3-4. The defendant indicated that he understood his rights and signed his name. Ex. D at 4. The defendant then stated that he wished for his defense attorney, who was present, to represent him in both the immigration case brought by Bosnian authorities and the extradition case initiated by U.S. authorities. Ex. D at 5. The defendant further stated, "I shall exercise my legal right to remain silent, and if I decide to give a statement, I shall inform the Prosecutor's office of Bosnia and Herzegovina through my defense attorney." Ex. D at 5. The defendant signed his statements. Ex. D at 5.

Approximately two weeks later, on July 25 and 26, 2017, the defendant attended meetings with U.S. law enforcement authorities.  These meetings focused on the defendant's desire to consider cooperating with the U.S. government.  In both meetings, U.S. law enforcement authorities did most of the talking, and the defendant made only limited statements.

The meeting on July 25, 2017 included the defendant, his attorney, the expert advisor from the Prosecutor's Office, three members of the JTTF, and an FBI interpreter.  Ex. E at 1.  At the outset of the meeting, the JTTF officers provided the defendant with a copy of the criminal complaint issued out of the Eastern District of New York and advised him to "read it to ensure [that] he understood fully the charges against him to-date."  Ex. E at 1.  The JTTF officers further explained that "these were the initial charges filed in EDNY and that additional charges would be forthcoming pertaining to his illegal conduct."  Ex. E at 1.  The defendant took approximately 40 minutes to read the complaint.  Ex. E at 1.  While reading the complaint, he made minimal comments, requesting clarification on the agent listed on the complaint and observing that the complaint went back to 2013.  Ex. E at 1.

After the defendant finished reading the complaint, the JTTF officers informed the defendant that "he is not obligated to speak with the FBI and that if at any time he wanted to speak privately with his defense coun[sel] regarding an issue raised during the interview, he should do so."  Ex. E at 1.  They also advised the defendant that this interview was separate and distinct from any previous interviews.  Ex. E at 1.  The JTTF officers then "explained some of the additional evidence supporting the charges" against the defendant and detailed the comprehensive and meticulous nature of the investigation against the defendant.  Ex. E at 1-2.

The defendant then inquired about cooperation.  He stated that "he knew of several types of cooperation" and "asked FBI investigators what type of cooperation they were looking

10

for from him."  Ex. E at 2.  In the conversation that followed, the JTTF officers provided an extensive explanation of the process for cooperation and the defendant's rights and obligations should he pursue cooperation, and the defendant repeatedly made inquiries and attempted to negotiate the terms of cooperation with his defense attorney present.  Ex. E at 2-4; see, e.g., Ex. E at 2 (JTTF officers explained to the defendant that "he would have to provide one-hundred percent truthfulness in order for it to be considered cooperation").  The defendant attempted to isolate one of the JTTF officers and negotiate with him alone, again inquiring about cooperation and its terms in detail, but the JTTF officer insisted that other officers and the defense attorney be present, and "made it clear there were no promises" and "the only person who could determine [the defendant's] sentence after cooperation would be a judge."  Ex. E at 2-3 (defendant "again said he is aware of different types of cooperation and asked [the JTTF officer] to tell him what he wants from [the defendant] and [the defendant] would see what he could do").  Throughout the conversation, the defendant demonstrated that he understood that there were consequences to making statements to the JTTF officers and that the statements could be used against him.  For example, the defendant "said he was concerned about being charged with lying," "repeatedly stated that he was talking to [the JTTF officer] yet not admitting any guilt until my conditions are met," and responded cautiously in describing his characterization of audio evidence.  Ex E at 2-3.

The defendant then requested an opportunity to speak privately with his attorney—a request that was honored—and conferred privately with his attorney for approximately 25 minutes.  Ex. E at 4.  The defendant's attorney subsequently invited the JTTF officers back into the room and told them (in the defendant's presence) that the defendant "needed time to make a decision," "requested time to evaluate his options," and "said he would continue to consider the option of cooperation."  Ex. E at 4.  The JTTF officers informed the defendant and his attorney that an

11

Assistant U.S. Attorney "was arriving the following day and that he would be more than willing to sit down with both [the defendant] and his defense attorney to give further details and discuss the potential for cooperation in the future." Ex. E at 4. The defendant requested, through his attorney, that they both appear the following day, and the parties agreed to meet the following day at the same location. Ex. E at 4. The defendant also confirmed that he was satisfied with his defense attorney "and he did not want anyone else." Ex. E at 4.

The government expects to introduce at trial various parts of the foregoing conversation from the first day's meeting, including that: the defendant stated that he could provide the FBI with "very big information" and the people that the FBI was asking for information about were "dangerous"; the defendant noted to law enforcement officers that "you have me cornered"; the defendant explained to law enforcement officers that, "If you were to give me access to my devices once again, I can go back online, recontact my associates and continue my activity, providing you that information, as long as you relocate me to Turkey" and that in Turkey, he has "access to people all over the world"; and the defendant belittled the evidence described in the criminal complaint as "paper evidence," but after hearing an audio recording of himself discussing sending foreign fighters to Syria he admitted, "that's good evidence."

The follow-up meeting on July 26, 2017 included the defendant, his attorney, the prosecutor and expert advisor from the Prosecutor's Office, the three members of the JTTF and FBI interpreter from the day before, as well as an Assistant U.S. Attorney from the Eastern District of New York. Ex. F at 1. At the outset of the meeting, the JTTF officers "thanked" the defendant "for again agreeing to speak with the FBI" and reiterated that "he is not obligated to speak with the FBI and that this interview is entirely voluntary on his part." Ex. F at 1. The defendant indicated that he understood this. Ex. F at 1. The JTTF officers further advised the defendant that

"if at any time he decides he is no longer interested in speaking to the FBI or the EDNY, he can ask that the interview be discontinued"; that "if this interview were to be conducted in the United States, he would be provided with an attorney to represent his interests"; and "should he have any questions or concerns during the interview, he should consult with his Bosnian court-appointed attorney before answering." Ex. F at 1.

The AUSA then discussed the potential for the defendant's cooperation with the defendant and his attorney. During the discussion, the AUSA made clear that cooperation would involve the defendant making statements that would be used against him. Ex. F at 2 (defendant's "statements and summary of his cooperation would later be furnished to the federal judge to consider during the sentencing phase of the prosecution"); Ex. F at 2-3 (defendant "is better off not signing a cooperation agreement" if unsure because a change-of-heart midway would result in the defendant being held accountable for his conduct and "the charges to which he had already plead guilty" without any leniency). Like the day before, the defendant requested a break and conferred privately with his attorney in the conference room, this time for approximately 10 minutes. Ex. F at 2. Afterwards, the defendant made some brief statements, noting that the situation "was not simple" and that "there are a lot of things to consider, and he would need more time to think and consider his options." Ex. F at 3. The defendant also requested an example plea agreement "tailored specifically to his situation," was provided one from another terrorism case, and thanked the AUSA in response. Ex. F at 3.

The government does not intend to introduce statements from the second day's follow-up meeting in its case-in-chief at trial, but seeks to preserve its ability to use them in redirect examination, cross-examination, or rebuttal to the extent they are required for purposes of completeness. See Fed. R. Evid. 410(b)(1).

13

ARGUMENT

I.     The Defendant's Motion Does Not Require an Evidentiary Hearing

The defense argues that the defendant's statements "should be suppressed" or in "the alternative, a hearing should be ordered."  ECF No. 55 at 18.  However, a hearing is not warranted because the defendant did not submit an affidavit based on personal knowledge in support of his motion and because there are no material facts in dispute.

The law is well-settled that a defendant has no absolute right to an evidentiary hearing on a motion to suppress.  See United States v. Gillette, 383 F.2d 843, 848 (2d Cir. 1967).  Rather, an evidentiary hearing is available only if there is a "factual issue to be resolved."  Id.; see also United States v. Viscioso, 711 F. Supp. 740, 745 (S.D.N.Y. 1989) (defendant must show "disputed issues of material fact" for evidentiary hearing).  To place a material fact in dispute, the defendant "must submit sworn factual allegations from an affiant with personal knowledge" in support of the suppression motion.  United States v. Larranga Lopez, No. 05-CR-655, 2006 WL 1307963, at *3 (E.D.N.Y. May 11, 2006) (Townes, J.) (citing cases).

Here, there is no factual issue to be resolved.  Defense counsel submitted a declaration stating that the factual support for the motion derives from the government's discovery, including FBI reports summarizing the defendant's statements.  ECF No. 54-1, ¶ 3.  The government agrees that the factual record for the motion consists of the referenced FBI reports and other portions of the discovery appended to this response.  The defense did not dispute or deny any of the facts set forth in the referenced FBI reports or discovery, and did not otherwise submit any declaration from the defendant himself or from anyone else with personal knowledge of the

14

events relevant to the motion.[2]  Therefore, the defendant did not put any material facts in dispute, and the Court should decide the motion without a hearing.

## II.  The Defendant's Statements Were Legally Obtained and Should Not Be Suppressed

The defense argues that statements that the defendant made to law enforcement authorities on four separate occasions should be suppressed because, in each instance, the defendant was subjected to custodial interrogation without being advised of his Miranda rights.  ECF No. 55 at 11.  However, as further explained below, the statements are admissible because the particular circumstances of each occasion rendered formal Miranda unnecessary.

### A.  Legal Standards

In Miranda v. Arizona, the Supreme Court established procedural safeguards, known as the Miranda rules, that apply in situations where the defendant is subject to "custodial interrogation" by the police.  384 U.S. 436 (1966); Illinois v. Perkins, 496 U.S. 292, 296 (1990).

The touchstone inquiry for determining whether the circumstances are "custodial" is "simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."  California v. Beheler, 463 U.S. 1121, 1125 (1983); see also Howes v. Fields, 565 U.S. 499, 509 (2012) ("whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in Miranda").  This inquiry does not turn simply on whether a defendant is "free to leave" a situation.  See United States v. Newton, 181 F. Supp. 2d 157, 168-69 (E.D.N.Y. 2002) (Trager, J.) (rejecting the "free to leave" test); see also United States v. FNU LNU, 653 F.3d 144, 152-53 (2d Cir. 2011) (interviews

---

[2] Defense counsel did declare that the defendant "does not admit that he made the statements attributed to him" in the FBI reports.  ECF No. 54-1, ¶ 3.  However, the showing required for a hearing "must be made by an affidavit of someone with personal knowledge of the underlying facts" and a "hearing is not required if the defendant's statements are general, conclusory or based on conjecture."  Viscioso, 711 F. Supp. at 745.  Defense counsel's declaration, presumably made to preserve some future trial defense, does not meet this standard.

15

conducted on public streets, at the border, and in prison—where defendant "was not free to leave

. . . either as a legal matter or in terms of how a reasonable person would view the situation"—may

nevertheless be non-custodial).  Instead, the inquiry delves into whether there were "inherently

coercive pressures that tend to undermine the individual's will to resist and to compel him to

speak."  Newton, 181 F. Supp. 2d at 168-69 (latter test "adheres more closely to Miranda's central

concern").  This inquiry is to be conducted by considering the totality of the circumstances and

applying an objective standard.  See Berkemer v. McCarty, 468 U.S. 420, 442 (1984); Stansbury

v. California, 511 U.S. 318, 321, 323 (1994) (per curiam) ("subjective views harbored by either

the interrogating officers or the person being questioned" irrelevant); United States v. Kirsteins,

996 F.2d 919, 923 (2d Cir. 1990) (subjective belief of defendant that he was not free to leave

irrelevant).  In sum, "the overarching custody question is whether a reasonable person in the

suspect's position would have understood herself to be subjected to restraints comparable to those

associated with a formal arrest."  FNU LNU, 653 F.3d at 152-53.

   "Interrogation" includes "express questioning or its functional equivalent."  Rhode

Island v. Innis, 446 U.S. 291, 301 (1980).  This includes words or actions "that the police should

know are reasonably likely to elicit an incriminating response."  Id.  It does not include words or

actions "normally attendant to arrest and custody" nor does it include all comments made in the

defendant's presence.  Id.; see United States v. Gelzer, 50 F.3d 1133, 1138 (2d Cir. 1995).

   If the situation rises to the level of custodial interrogation, the Miranda rules require

that police inform the defendant, before questioning, that "he has the right to remain silent, that

anything he says can be used against him in a court of law, that he has the right to the presence of

an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any

questioning if he so desires."  384 U.S. at 478-79.  A precise recitation of those rights is not

necessary so long as the warnings given adequately convey their substance.  See California v. Prysock, 453 U.S. 355, 359-61 (1981) ("no talismanic incantation" required").

B.   Discussion

1.   The Defendant's March 27, 2012 Statements to Law Enforcement Officers While Standing Outside a Subway Station Are Admissible

The defense argues that statements that the defendant made to law enforcement officers on March 27, 2012, while standing outside a Brooklyn subway station, should be suppressed because he was in custody during the conversation.  That argument is without merit.

The defendant was not in custody during the March 27, 2012 interview.  The undisputed circumstances of the interview show that the defendant was not under arrest or physically restrained in any way; he was interviewed in public on a New York City street, "outside the Avenue H Subway station" in Brooklyn; and only two law enforcement officers were present. The contents of the interview reveal that it was a typical intelligence collection conversation; and, after the defendant refused to provide any specific information about extremists and stated that he had "never done anything illegal," the conversation ended and the defendant left.  Ex. B at 1-2. Stopping and questioning an individual on a public street in this manner—an often-routine part of police work—does not constitute "custody" for Miranda purposes.  See Maryland v. Shatzer, 559 U.S. 98, 113 (2010) ("temporary and relatively nonthreatening detention" during Terry stop "does not constitute Miranda custody"); Cruz v. Miller, 255 F.3d 77, 85 (2d Cir. 2001) (state court not unreasonable in concluding that suspect was not in custody when officers with guns drawn ordered him not to move, frisked him and radioed for other officers to bring eyewitness to identify him, where officers reholstered guns after determining suspect was not armed, questioning was very brief and occurred on a public street and suspect was not handcuffed); United States v. Wong Ching Hing, 867 F.2d 754, 756 (2d Cir. 1989) (suspect not in custody during 30-minute traffic

17

stop); United States v. Reyes, No. 11-CR-58, 2012 WL 363042, at *7 (S.D.N.Y. Feb. 1, 2012)

(suspect not in custody when "the questioning took place on a public street; no guns were drawn;

no physical restraints were used, apart from the brief frisk; and only two of the agents actually

asked [him] questions"); see also, e.g., United States v. Flores-Sandoval, 474 F.3d 1142, 1146-47

(8th Cir. 2007) (sidewalk questioning was consensual encounter and suspect was not in custody);

United States v. Wyatt, 179 F.3d 532, 536-37 (7th Cir. 1999) (same); United States v. Gibson, 392

F.2d 373, 376 (4th Cir. 1968) (same).  Indeed, the defense does not cite a single case in which a

court found an individual to have been in "custody" in comparable circumstances.  See ECF No.

55 at 13 (citing only Tankleff v. Senkowski, 135 F.3d 235, 244 (2d Cir. 1998), which pertained to

stationhouse interview).[3]

      The defense argues that "the increasingly hostile and accusatory tone of the

[officers'] questioning" during the conversation rendered the defendant in custody for Miranda

purposes.  ECF No. 55 at 11.  This argument fails for two reasons.  First, the defense does not offer

any evidence, either in a sworn affidavit or from the FBI reports, that the JTTF officers' tone was

actually "hostile" or "accusatory."  ECF No. 55 at 11-12; see United States v. Aparo, 221 F. Supp.

2d 359, 369 (E.D.N.Y. 2002) (failure to submit affidavit alleging facts required for suppression

resulted in denial of motion).  To the contrary, the reports make clear that the defendant was

---

    [3] In United States v. McDow, 206 F. Supp. 3d 829 (S.D.N.Y. 2016), the district
court found that an instance of sidewalk questioning rose to the level of Miranda custody requiring
Miranda warnings.  In that case, "the officers conveyed through their actions that [the defendant]
was not free to leave" because the officers' "questioning clearly communicated that the officers
suspected that [the defendant] was carrying contraband" and the officers "also exercised control
over [the defendant's] movements by blocking his ability to walk away, by searching his person,
and by instructing him to unlock the front door to a nearby building and walk inside, where the
interrogation continued."  Id. at 847.  The district court found that, in those circumstances, a
reasonable person in the defendant's position "would not have felt free to leave" and the defendant
was "subject to a 'restraint of freedom of movement akin to that associated with a formal arrest.'"
Id.  The defendant in this case alleges no such restraints nor did any exist.

engaging in a conversation with a familiar law enforcement agent, where the discussion principally focused on what information the defendant could provide about other individuals, and the contents of the statements evidenced a conversational back-and-forth in which the defendant offered to assist in some ways (volunteering to call if he became aware of a specific threat) and refused in others (declining to name specific extremists).

Second, even if the tone of the officers' questioning was "hostile" and "accusatory," that alone would not make the encounter custodial.  There is simply no legal authority for the proposition that the mere tone of questioning can transform an individual who is at liberty on a city street into an individual who is in custody.  See FNU LNU, 653 F.3d at 154 (rejecting "look[ing] only at any single factor" and emphasizing that "the inquiry remains a holistic one in which the nature and context of the questions asked, together with the nature and degree of restraints placed on the person questioned, are relevant").

Finally, the defense argues that various circumstantial factors rendered the defendant in "custody," but these circumstantial claims are either exaggerated or belie a claim of hostility.  The defense claims that the defendant was "outnumbered by the agents," ECF No. 55 at 12; but, as is standard with law enforcement interviews, two agents were present, Ex. B at 1.  The defense claims that "despite [the defendant] twice affirmatively stating that he did not want ongoing discussions with law enforcement, the questioning persisted."  ECF No. 55 at 12.  However, when properly read in context, the defendant's decision not to engage in "ongoing discussions" with law enforcement was a reference to his desire not to serve as an informant in the future, not a reference to the instant conversation.  Ex. B at 1-2 (defendant stated that he "has no interest in establishing any sort of ongoing communications with law enforcement" and stated that "he would not like to have any sort of relationship with law enforcement, but would certainly call

law enforcement if he became aware of any type of threat, here or abroad").  The defense does not claim that the officers' weapons were drawn, or even visible, and the defense concedes that "[r]estraints were not used."  ECF No. 55 at 12.  Taken together, these circumstances compel the conclusion that the defendant was not in custody.

> 2.   The Defendant's July 18, 2012 Statements to Law Enforcement Officers at JFK International Airport Are Admissible

The defense argues that statements that the defendant made to law enforcement officers on July 18, 2012 at JFK International Airport should be suppressed because he was in custody during the conversation.  That argument is, again, unpersuasive.

The defendant was not in custody during the July 18, 2012 interview.  The undisputed circumstances of the interview demonstrate that the defendant was not under arrest or physically restrained in any way, and the questions were all relevant to the defendant's "No-Fly" status and, therefore, his ability to depart the United States.  This type of inquiry is well within the realm of "constraints and questions" that a reasonable person would expect in the context of international air travel and airport security.  FNU LNU, 653 F.3d at 154-55 (reasonable person expects certain degree of "both constraints and questions" when crossing border); United States v. Soto, No. 13-CR-76, 2014 WL 3695990, at *4 (E.D.N.Y. July 24, 2014) (Brodie, J.) (expectation applicable to both outgoing and incoming travelers); see also United States v. Silva, 715 F.2d 43, 46-47 (2d Cir. 1983) (abrogated in irrelevant part).

The defense argues that the Court should take special note of "the nature of the questioning" because it broached topics such as the defendant's prior foreign military experience, harboring of extremist views, and association with known extremists.  ECF No. 55 at 14-15.  However, such questions are not out of place in the specific context of an interview at the border—they are within the ambit of questions relevant to border security.  See United States v.

Velentzas, No. 15-CR-213, 2019 WL 3252961, at *9 (E.D.N.Y. July 16, 2019) (Johnson, J.) ("because national security is of paramount importance to a sovereign nation," questions posed to an individual under investigation for terrorism offenses by FBI agent at LaGuardia Airport during secondary inspection about personal history, potential ties to terrorists or terrorist organizations, extremist ideology and publications, and communications were not "materially outside the scope of border security questions"); see also Tabbaa v. Chertoff, 509 F.3d 89, 93 (2d Cir. 2007) (characterizing questions about the purpose and content of an Islamic conference that individuals had attended, and that was the subject of a potential national security concern, as "not materially different than the types of questions border officials typically ask prospective entrants"). Moreover, in the specific context of this defendant's interview at the border—which was prompted by, and revolved around, the defendant's "No-Fly" status, and during which the defendant actively inquired about ways to get off that list—the questions asked were within the range of inquiries that a reasonable person would expect to arise in a conversation about that status. See FNU LNU, 653 F.3d at 154 ("the fact that the questions asked fall within the range of inquiries one expects will, by itself, be enough to assure a reasonable person that he or she is not under arrest"). Likewise, the remaining questions were routine border questions pertaining to the defendant's identification, purpose of travel, and associates who had assisted him with his travel. See FNU LNU, 653 F.3d at 156 (Jacobs, Ch. J., concurring) (questions asked about "name, country of birth, citizenship, etc." were routine border questions).

Finally, the defense argues that other circumstantial factors suggest that the defendant was in custody, but none is remarkable in the border context. The defense notes that the defendant's travel plans "were forcibly aborted," he was "taken from the boarding area" and "escorted" "to a separate, private location" inside the terminal, the interview was "considerably

lengthier" than sidewalk questioning, and he "was not told he was free to leave." ECF No. 55 at 13-14. These are all relatively routine features of airport interviews and do not, in themselves, require a finding of custody. Moreover, the defense does not claim that the officers' weapons were drawn, or even visible, or that restraints were used, distinguishing this situation from border encounters that might be found to be custodial. See, e.g., FNU LNU, 653 F.3d at 154-55 (defendant not in custody where airport interview "took place in a closed room, out of public view," "armed guards escorted the defendant there and remained in the vicinity," it "lasted for 90 minutes," law enforcement officer "took the defendant's fingerprints and did not inform her she was free to go," and she "was not, in fact free to go," but "the officers never drew their weapons," "no physical restraints were used," and "crucially, a reasonable person would recognize all [of the officer's] questions as relevant to her admissibility"); Velentzas, 2019 WL 3252961, at *10 (defendant not in custody where interview took place in a conference room at LaGuardia Airport, "door was closed and unlocked," "there were five officers in the room," she "was not told she was free to leave," but "she was neither handcuffed nor restrained, weapons were not drawn, she declined the opportunity to take a break during the interview," and the duration of the interview at 30 minutes was "a reasonable one at the border"); cf. United States v. Ali, 68 F.3d 1468, 1473 (2d Cir. 1995), on reh'g, 86 F.3d 275 (2d Cir. 1996) (airline passenger in custody where he "was asked to step away from the boarding area, his travel documents were removed, and he was surrounded by seven officers with visible handguns"); United States v. Uribe-Velasco, 930 F.2d 1029, 1033 (2d Cir. 1991) (defendant in custody when officer approached him from behind, told defendant not to move and kept his hand on defendant's back during questioning, and eight other officers surrounded him with guns drawn). All of these considerations lead to the conclusion that the defendant was not in custody during this routine border interview.

3.    The Defendant's July 25-26, 2017 Statements to Law Enforcement Officers at Meetings in Bosnia Are Admissible

The defense argues that statements the defendant made to U.S. law enforcement officers on July 25-26, 2017, at meetings in Bosnia, should be suppressed because he was subjected to custodial interrogation without being advised of his Miranda rights.  That argument also fails.

The defendant was not in custody for Miranda purposes during the July 25-26, 2017 interviews.  To be sure, the defendant was detained by Bosnian authorities in connection with immigration charges in Bosnia and an extradition request from the United States.  However, the circumstances of the interviews show that they were akin to consensual meetings: the defendant attended the meetings in a conference room, accompanied by his court-appointed defense attorney, curious about the terms and conditions under which he might be able to cooperate with the U.S. government, and was told he did not have to answer questions.  There is no claim that the officers touched the defendant, threatened him, carried weapons, or even used physical restraints.  In such circumstances, the defendant is not in custody for Miranda purposes because there was "no measure of compulsion above and beyond that inherent in custody itself."  Georgison v. Donelli, 588 F.3d 145, 157-58 (2d Cir. 2009); see also Howes, 565 U.S. at 514-17 (prison inmate not in custody when questioned in private prison conference room about events that took place outside prison); United States v. Zygmont, No. 12-CR-152, 2013 WL 3246139 (D.Vt. June 26, 2013) (prison inmate not in custody where restraints—including handcuffs—were attributable to status as an inmate, interviewers neither touched nor threatened to touch the defendant, the defendant was not affirmatively advised that he could terminate the interview and leave the interview, the interview was of the defendant as a witness to an unrelated offense, and the interview terminated when interviewers believed the defendant was being deceptive, rather than continuing to question the defendant more aggressively).

23

The defendant was also not subjected to "interrogation" during the interviews.  The interviews primarily consisted of the U.S. authorities speaking in a declarative manner—laying out the charges, the evidence, and the process for cooperation.  Those statements were not the functional equivalent of express questioning.  See United States v. Stroman, 420 F. App'x 100, 102 (2d Cir. 2012) (summary order) ("Not all statements by the police regarding the nature and strength of the evidence against a defendant constitute interrogation or its functional equivalent."); see, e.g., Easley v. Frey, 433 F.3d 969, 974 (7th Cir. 2006) ("matter-of-fact communication of the evidence against [defendant] and the potential punishment he faced" was not functional equivalent of interrogation); Acosta v. Artuz, 575 F.3d 177, 191-93 (2d Cir. 1991) (statement to suspect that a victim had identified him in a line-up was not functional equivalent of interrogation); United States v. Miller, 116 F.3d 641, 680 (2d Cir. 1997) (not interrogation where defendant solicited agent's statement about cooperation by expressing concern for his family if he were imprisoned and asking about charges against him and possible penalties); United States v. Guido, 704 F.2d 675, 677 (2d Cir. 1983) ("suggestion" by agents that defendant consider cooperating was not interrogation where agents also told defendant that he would not be questioned at that time and that he should discuss cooperation with his lawyer).

The defense argues that the AUSA's statement that the defendant "should consider the time sensitive aspect of the information he may possess" renders the AUSA's comments "interrogation" for Miranda purposes, citing Campaneria v. Reid, 891 F.2d 1014, 1021 (2d Cir. 1989).  However, the AUSA made important additional statements that distinguish this case from Campaneria: that "this was a difficult decision" and "not one to be taken lightly," that the AUSA was "not looking for a decision immediately," and that the AUSA would "continue to seek permission of the host country prosecutors to continue to engage with [the defendant] as needed

24

in the future." Ex. F at 3.  Moreover, the government is not seeking to use the statements that the

defendant made on the second day of questioning in its case-in-chief at trial; that day was the only

day in which the AUSA participated.  Therefore, the AUSA's statement about cooperation is not

relevant to the analysis of whether the defendant's statements from the first day of questioning

were the product of custodial interrogation.  In light of all of the circumstances, they were not.

<u>CONCLUSION</u>

For the reasons set forth above, the government respectfully requests that the Court

deny the defendant's motion to suppress without a hearing.

Dated: Brooklyn, New York
      October 16, 2019

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:       /s/                         
Saritha Komatireddy
David K. Kessler
J. Matthew Haggans
Assistant U.S. Attorneys
(718) 254-7000

cc:    Clerk of Court (NGG) (By ECF)
       All Counsel of Record (By ECF and Email)