UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------X

UNITED STATES OF AMERICA

    – against –

                                Cr. No. 17-449 (NGG)

MIRSAD KANDIC,

       Defendant.

--------------------------------X


**MEMORANDUM OF LAW IN SUPPORT OF
THE PRETRIAL MOTIONS FOR
MIRSAD KANDIC**

*James M. Branden*   *Bobbi C. Sternheim*
*551 Fifth Avenue*   *33 West 19th Street*
*Suite 422*   *Fourth Floor*
*New York, NY 10176*   *New York, NY 10011*
*212-286-0173*   *212-243-1100*

*Attorneys for Defendant Mirsad Kandic*

# TABLE OF CONTENTS

*Page No.*

Table of Authorities. . . . . . . . . . . . . . . . . . . ii

Preliminary Statement . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . 1

    Questioning of Mr. Kandic. . . . . . . . . . . . . . . 1

        January 13, 2011. . . . . . . . . . . . . . . . . 1

        March 27, 2012. . . . . . . . . . . . . . . . . . 2

        July 18, 2012 . . . . . . . . . . . . . . . . . . 3

        July 25, 2017 . . . . . . . . . . . . . . . . . . 4

        July 26, 2017 . . . . . . . . . . . . . . . . . . 7

ARGUMENT
    STATEMENTS ALLEGEDLY MADE BY MR. KANDIC
    TO LAW ENFORCEMENT, WITHOUT WARNING, ON
    MARCH 27 AND JULY 18, 2012, AND ON JULY
    25 AND 26, 2017, SHOULD BE SUPPRESSED.
    U.S. CONST. AMEND. V; MIRANDA V. ARIZONA,
    384 U.S. 436 (1966). . . . . . . . . . . . . . . . . . 8

    Applicable Legal Principles . . . . . . . . . . . . 8

    Discussion. . . . . . . . . . . . . . . . . . . . . 11

        March 27, 2012 . . . . . . . . . . . . . . . . . 11

        July 18, 2012. . . . . . . . . . . . . . . . . . 13

        July 25, 2017. . . . . . . . . . . . . . . . . . 15

        July 26, 2017. . . . . . . . . . . . . . . . . . 17

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . 18

i

# TABLE OF AUTHORITIES

*Page No.*

Cases

Berkemer v. McCarty,
    468 U.S. 420 (1984). . . . . . . . . . . . . . . . . . . 9

California v. Beheler,
    463 U.S. 1121 (1985) . . . . . . . . . . . . . . . . . . 9

Campaneria v. Reid,
    891 F.2d 1014 (2d Cir. 1989) . . . . . . . . . . . 10, 17

Cruz v. Miller,
    255 F.3d 77 (2d Cir. 2001) . . . . . . . . . . . . . . 8

Howes v. Fields,
    565 U.S. 499 (2012). . . . . . . . . . . . . . . . . . 9

Illinois v. Perkins,
    496 U.S. 292 (1990). . . . . . . . . . . . . . . . . . 8

Miranda v. Arizona,
    384 U.S. 436 (1966). . . . . . . . . . . . . . . . . 8, 10

Rhode Island v. Innis,
    446 U.S. 291 (1980). . . . . . . . . . . . . . . . . . 9

Tankleff v. Senkowski,
    135 F.3d 235 (2d Cir. 1998). . . . . . . . . . . . . 9, 13

United States v. Ali,
    68 F.3d 1468 (2d Cir. 1995). . . . . . . . . . . . 13-14

United States v. Badmus,
    325 F.3d 133 (2d Cir. 2003). . . . . . . . . . . . . . 12

United States v. Bin Laden,
    132 F.Supp.2d 168 (S.D.N.Y. 2001). . . . . . . . . . . 10

United States v. FNU LNU,
    653 F.3d 144 (2d Cir. 2011). . . . . . . . . . . 9, 10, 14

United States v. Kirsteins,
    906 F.2d 919 (2d Cir. 1990). . . . . . . . . . . . . . 11

ii

Cont'd

*Page No.*

<u>United States</u> v. <u>Mitchell</u>,
    966 F.2d 92 (2d Cir. 1992) . . . . . . . . . . . . . . . 9

<u>United States</u> v. <u>Montana</u>,
    958 F.2d 516 (2d Cir. 1992) . . . . . . . . . . . . . . 10

<u>United States</u> v. <u>Szymaniak</u>,
    934 F.2d 434 (2d Cir. 1991) . . . . . . . . . . . . 10, 16

<u>United States</u> v. <u>Yunis</u>,
    859 F.2d 953 (D.C. Cir. 1998) . . . . . . . . . . . . . 10

<u>U.S. Constitution</u>

U.S. Const. Amend. V. . . . . . . . . . . . . . . . . . . . 8

Preliminary Statement

Mr. Kandic was born in Peje, Kosovo, in 1981.  He moved to this Country in 2003 and resided first in the Bronx and then Brooklyn, New York.  According to discovery provided by the government in this matter, Mr. Kandic left the country in late 2013.

Indictment 17-449 (NGG), from the Eastern District of New York (EDNY), was returned against Mr. Kandic on August 17, 2017.  He is charged in six counts with conspiring to and providing material support and resources to the Islamic State of Iraq and al-Sham (ISIS) from 2013 to 2017, in violation of 18 U.S.C. §2339B(a)(1).  This memorandum of law is submitted in support of his pretrial motion to suppress statements allegedly made to law enforcement.

**STATEMENT OF FACTS**

Questioning of Mr. Kandic

Prior to the return of the Indictment, Mr. Kandic was interviewed by law enforcement agents on five separate occasions.

January 13, 2011

In 2011, Mr. Kandic was employed as a Yellow Cab driver for Waheed Brokerage.  In early January, agents from the Federal Bureau of Investigation (FBI) reached out to his employer and asked that Mr. Kandic call back.  Mr. Kandic returned the call on January 13, 2011.  The FBI inquired about certain reported accidents involving his cab.  Mr. Kandic assured the FBI that these were in fact

legitimate.  <u>See</u> Exhibit 1 (FBI 302 dated February 7, 2011 (memorializing the January 13, 2011 telephone conversation)).

<u>March 27, 2012</u>

More than one year later, on March 27, 2012, FBI agents caught up with Mr. Kandic outside the Avenue H subway station.  No <u>Miranda</u> warnings were provided.

The agents inquired with regard to "an apparent discrepancy related to his prior military service."  Mr. Kandic stated that he had no military experience, here or overseas.

The agents also asked about his immediate family.  Mr. Kandic said that a brother and a sister lived in the Bronx and that his parents resided in Kosovo.

Mr. Kandic was asked whether he adhered to any extremist views, which he denied.  He further denied having any associates with such views.  Mr. Kandic denied knowing anyone arrested for terrorism.  Mr. Kandic was asked for names of people who espoused extremist views or individuals and/or websites that provided "the right information" about Islam.  In response to further questioning, Mr. Kandic listed his places of worship, the masjid at Bedford and Cortelyou and the one at 20th Avenue and 64th Street, both in Brooklyn.

He specifically denied knowing Agron Hasbasrami and Bryant Vinas.

Mr. Kandic was asked where he banked and the manner in which

2

he sent money overseas.

████████████████████████████████████████

At different times during the questioning, Mr. Kandic stated that he "would not like any sort of relationship with law enforcement" and he had "no interest in establishing any sort of ongoing communications with law enforcement."  See Exhibit 2 (FBI 302 dated March 28, 2012 (memorializing interview of March 27, 2012)).[1]

July 18, 2012

Mr. Kandic appeared at JFK International Airport on July 18, 2012.  A uniformed, and presumably armed, Port Authority Police Officer informed him that he would not be permitted to fly to Frankfurt, and onto Serbia and Montenegro as planned.  The Police Officer escorted him, presumably away from the boarding area, to a meeting with FBI Special Agent Trigg and HSI Agent Charles Reich. The agents explained to Mr. Kandic that he was on the TSA no-fly list.  They said he was on the list because of "existing allegations that [Mr.] Kandic had made statements in support of extremism and jihad and . . . information regarding [Mr.] Kandic's involvement in the military in Kosovo in the late 1990s," which contradicted his statements made in the March 27 interview.

---

[1] The 302 does not indicate the duration of the interview.  Nor does it indicate whether the agents were armed.

3

Mr. Kandic was not read <u>Miranda</u> warnings. He was only told that he must be truthful because lying to the FBI is a felony.

All in response to the agents' inquiries, Mr. Kandic stated the following: a) that he had in fact registered with an organization related to the Kosovo Liberation Army, but received training in plumbing and did not fight in a war; b) he entered the United States with false identification; c) he wanted to travel to Serbia/Montenegro to visit his parents for Ramadan; d) he was presently employed at the Islamic Center of New York; e) he held no extremist views; f) he had no active email accounts; g) he did not use the internet to access extremist sites; h) for a time, he studied Arabic via Skype; I) he did not own a computer but he and his roommate from time to time used a borrowed one; and, j) he rarely sent money overseas.

Mr. Kandic was also shown a series of photographs. He denied recognition of 15 men, including Agron Hasbajrami and Bryant Vinas. Of those he did recognize, Mr. Kandic said they were not extremists. <u>See</u> Exhibit 3 (FBI 302 dated July 23, 2012, memorializing July 18, 2012 interview)).[2]

<u>July 25, 2017</u>

On June 30, 2017, Mr. Kandic was arrested in Sarajevo and charged with violating travel regulations of Bosnia and

---

[2]

The 302 did not indicate the duration of the interview by the Port Authority officer or the federal agents.

4

Herzegovina.  During his period of detention, a criminal complaint was filed against Mr. Kandic in the EDNY charging him with providing material support to ISIS.

On July 25, 2017, in a conference room on the main level of the Prosecutor's Office in Sarajevo, Mr. Kandic was interviewed by investigators and agents from the Joint Terrorism Task Force.  Mr. Kandic was provided a copy of the criminal complaint and was allowed time to read it.

Mr. Kandic was not provided <u>Miranda</u> rights.  The agents, however, advised that he was not obligated to speak to them and that he could speak privately with defense counsel at any time during the interview.  Defense counsel was Zumreta Akajic Muftic, provided by the Bosnia and Herzegovina court.  She was assisted by an interpreter "as needed."

The agents cited portions of the complaint and itemized some additional evidence supporting the charges, including his use of online/mobile messaging accounts.  When asked whether Australian suicide bomber Jake Bilardi was "possibly mentally disabled," Mr. Kandic shook his head "no."  The agents indicated their awareness of others he "facilitated" and of his family's "whereabouts and activities."

Mr. Kandic asked the agents what type of "cooperation" they sought.  He also said that he was "concerned about being charged with lying . . . and he was willing to write down things he has

5

done but he was concerned about getting additional charges regarding lying." Mr. Kandic was provided with paper to write down a statement.

After some deliberation, an agent informed Mr. Kandic that he had to provide "some information as a good faith gesture so that in return [the agent] can tell his colleagues, inform the prosecutor, and discuss different ways of cooperation." The same agent reminded Mr. Kandic that he was aware of Mr. Kandic's "facilitation of people, his work with forged documents, how people fund each other within ISIS, and who funded [him.]"

Mr. Kandic said that he could provide "very big information" but he felt cornered with no way out. He wanted guaranteed freedom for the information and safety. He added: "If you were to give me access to my devices once again, I can go back online, recontact my associates and continue my activity, providing you that information, as long as you relocate me to Turkey [because] in Turkey, [I have] access to people all over the world."

When Mr. Kandic challenged what he described as "paper evidence," the agents played an audio clip, which Mr. Kandic described as "good evidence." He asked to speak privately with his attorney. After speaking with her, the interview was continued to the following day.

The July 25 interview was nearly three hours long. See Exhibit 4 (FBI 302 dated August 10, 2017 (memorializing the July

6

25, 2017 interview)).

<u>July 26, 2017</u>

On July 26, 2017, Mr. Kandic and his attorney, again with the assistance of an interpreter, met with agents and an EDNY AUSA in the same conference room.   <u>Miranda</u> rights were not provided. Rather, Mr. Kandic was told by agents that he was not obligated to speak with the FBI, his participation was entirely voluntary, and the interview could be discontinued at his request at any time. Last, Mr. Kandic was told that if he submitted to an interview in the United States, he would be provided with an attorney to represent his interests.

The AUSA explained that following his indictment in the EDNY, a formal extradition request would be made.  He refused to advise Mr. Kandic about extradition, however, and advised him to consult with Ms. Muftic about that.  As to the criminal matter in EDNY, he told Mr. Kandic that he had two options: cooperate or go to trial. As to the first option, it was emphasized that Mr. Kandic "should consider the time sensitive aspect of the information he may possess, particularly with regard to any possible threat information, because that could benefit him in his cooperation with the FBI/EDNY."

After a further explanation by the AUSA of what cooperation would entail, Mr. Kandic stated that the "situation was not simple. He is willing to cooperate but there are a lot of things to

consider, and he would need more time to think and consider his options."  The interview lasted 1 hour and 40 minutes.  <u>See</u> Exhibit 5 (FBI 302 dated September 19, 2017 (memorializing the July 26, 2017 interview)).

## ARGUMENT

> STATEMENTS ALLEGEDLY MADE BY MR. KANDIC TO LAW ENFORCEMENT, WITHOUT WARNING, ON MARCH 27 AND JULY 18, 2012, AND ON JULY 25 AND 26, 2017, SHOULD BE SUPPRESSED.  U.S. CONST. AMEND. V; <u>MIRANDA</u> V. <u>ARIZONA</u>, 384 U.S. 436 (1966).

<u>Applicable Legal Principles</u>

The Fifth Amendment to the United States Constitution provides that: "No person . . . shall be compelled in any criminal case to be a witness against himself."  Based on this Amendment, the Supreme Court has determined that, prior to questioning, those in custody must be advised of their rights pursuant to <u>Miranda</u> v. <u>Arizona</u>, 384 U.S. 436 (1966).  <u>See</u> <u>Illinois</u> v. <u>Perkins</u>, 496 U.S. 292, 296 (1990); <u>see</u> <u>also</u> <u>Cruz</u> v. <u>Miller</u>, 255 F.3d 77, 80-81 (2d Cir. 2001).  <u>Miranda</u> rights are by now well known and include: that the suspect has the right to remain silent, that anything he says may be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.  <u>Miranda</u>, <u>supra</u>, 384 U.S. at 478-79.

8

In determining whether the suspect is in custody, the inquiry is whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. California v. Beheler, 463 U.S. 1121, 1125 (1985); see also Howes v. Fields, 565 U.S. 499 (2012) (did the relevant environment present the same inherently coercive pressures as the station house questioning at issue in Miranda). Stated another way, the issue is whether the suspect was free to leave. See United States v. Mitchell, 966 F.2d 92, 98 (2d Cir. 1992). The test is an objective one, based on a reasonable person in the suspect's position. Berkemer v. McCarty, 468 U.S. 420, 442 (1984).

Factors recognized by the Second Circuit include: the interrogation's duration; its location; whether the suspect volunteered for the interview; whether the officers used restraints; whether weapons were present and, perhaps, drawn; and, whether officers told the suspect he was free to leave or was under suspicion. See United States v. FNU LNU, 653 F.3d 144, 153 (2d Cir. 2011); see also Tankleff v. Senkowski, 135 F.3d 235, 244 (2d Cir. 1998).

"Interrogation" includes express questioning of the suspect and its "functional equivalent," meaning any words or actions on the part of law enforcement that are reasonably likely to elicit an incriminating response. Rhode Island v. Innis, 446 U.S. 291, 301 (1980). In the latter regard, an agent's statements about the

9

benefits of cooperation constitutes interrogation if the statement was not solicited by the suspect. See United States v. Montana, 958 F.2d 516, 518 (2d Cir. 1992); see also Campaneria v. Reid, 891 F.2d 1014 (2d Cir. 1989) (prosecutor's statement to defendant that "[i]f you want to talk to us, now is the time to do it" was interrogation). In addition, confronting the suspect with incriminating information learned from another suspect and asking that he make a statement is interrogation. See United States v. Szymaniak, 934 F.2d 434, 439 (2d Cir. 1991).

Miranda applies at the border. See United States v. FNU LNU, supra, 653 F.3d at 153. And, with regard to the "in custody" prerequisite of Miranda, the nature of the questioning at the border is especially important. Id.

Miranda also applies to overseas interrogations conducted by U.S. law enforcement, even if the suspect is in the physical custody of foreign authorities. See United States v. Bin Laden, 132 F.Supp.2d 168, 186 (S.D.N.Y. 2001). Thus, "a defendant's statements, if extracted by U.S. agents acting abroad, should be admitted as evidence at trial only if the Government demonstrates that the defendant was first advised of his rights and that he validly waived those rights." Id. at 187; see also United States v. Yunis, 859 F.2d 953, 970-71 (D.C. Cir. 1988) (Mikva, J., concurring, reaching same conclusion).

Discussion

Mr. Kandic does not seek to suppress statements allegedly made by him in the telephonic interview of January 13, 2011 as that interview was non-custodial. See United States v. Kirsteins, 906 F.2d 919, 924 (2d Cir. 1990) (suspect who appeared voluntarily at U.S. Attorney's Office in response to a request for an interview was not in custody). However, the statements made by him in the four interviews that followed should be suppressed as they constituted custodial interrogation without preceding advice of Miranda rights.

### March 27, 2012

Mr. Kandic was clearly the subject of interrogation on March 27, 2012. The closer question was whether he was in custody. As set forth below, that question should be answered in the affirmative based principally on the increasingly hostile and accusatory tone of the questioning itself.

The relevant Second Circuit factors will be addressed *seriatim*. As to duration, the 302 did not indicate how long the interview lasted. However, based on the numerous topics broached and covered (e.g., military service, family members, places of worship, extremists views, extremist associates, internet use, place/manner of banking, sexual proclivities), the interview was by no means brief or incidental, on the contrary, it was lengthy, insistent and increasingly accusatory. As such, duration supports

11

a finding of "in custody."   That the interview was conducted
outside a subway station does nothing to further the analysis.   It
cannot fairly be said that Mr. Kandic "volunteered" for the
interview.  He was accosted at a subway station, outnumbered by the
agents, and peppered with alarming questions, and despite twice
affirmatively stating that he did not want ongoing discussions with
law enforcement, the questioning persisted.   This factor also
favors a finding of "in custody."  Restraints were not used.  The
302 did not make clear whether the agents were armed and if so
whether guns were drawn, but it seems likely they were armed, as
they usually are.  This factor, thus, also favors a finding of "in
custody."  Based on the conspicuous absence of such a note in the
302, the agents did not inform Mr. Kandic that he was free to
leave.  Cf. United States v. Badmus, 325 F.3d 133, 139 (2d Cir.
2003) (defendant not in custody where agents told him he was not
under arrest and they would leave if he asked).  As such, the
majority of factors – except for the location (which cuts neither
way) and the lack of restraints – support the conclusion that Mr.
Kandic was in custody when questioned by the agents on March 27,
2012.  Finally, in this regard, the court will note the serious
and, indeed, aggressive and hostile nature of the questioning,
including inquiries about "an apparent *discrepancy* related to his
prior military service," his extremist views, websites he visited,
places he worshiped, places he banked, manner in which he sent

12

money overseas, whether he knew specific people, ████████████

████████████████████████████████

████████ Thus, even were the court to find there was some initial voluntariness to the interview, the nature of the questioning turned it decidedly custodial. See Tankleff v. Senkowski, 135 F.3d 235, 244 (2d Cir. 1998) (murder suspect who voluntarily accompanied police to station but then was subjected to "increasingly hostile questioning" was in custody).

Because the custodial interrogation was not preceded by Miranda warnings, the statements allegedly made should be suppressed.

### July 18, 2012

Mr. Kandic was clearly interrogated on July 18, 2012, at JFK Airport, and, again, the closer question is whether he was in custody. Here, too, the answer is yes.

Comparing the relevant 302s, the July 18 interview (in fact, two interviews) was considerably lengthier than the March 27 interview, and included a photographic array of 20 or more individuals. As such, duration suggests custody even more so here. Unlike the relatively benign location at issue on March 27, Mr. Kandic, on July 18, was taken from the boarding area to a separate, private location inside Terminal 1 at JFK Airport to meet with federal agents. The location of the interview thus further suggests Mr. Kandic was in custody. See United States v. Ali, 68

F.3d 1468, 1473 (2d Cir. 1995) (remanding for reconsideration of "custody" determination based in part on fact that defendant was asked to step away from the boarding area). Mr. Kandic did not volunteer for the interview. On the contrary, his expected travel plans were forcibly aborted and he was escorted by a uniformed, and presumably armed, police officer to a private room for a meeting with FBI, not TSA, agents. It is unclear whether handcuffs were used, but suffice it to say, Mr. Kandic was removed from the boarding area and "escorted" to a private room. It is also unclear whether the federal agents carried firearms, though they usually do while on duty. Mr. Kandic was not told he was free to leave. Thus, the relevant factors compel the conclusion that Mr. Kandic was in custody when interviewed on July 18, 2012.

Finally, in this regard, the court should take special note of the aggressive and hostile manner of questioning in reaching its conclusion as to custody. See United States v. FNU LNU, supra. The agents did not just ask questions, they accused Mr. Kandic, from the get-go, of misrepresenting his prior military experience and of harboring extremist views. These accusations made it clear that the Mr. Kandic had been under continued and extensive investigation since the March 27 interview. And if that was not immediately apparent, the FBI agents' ready access to a photo array containing people Mr. Kandic knew drove home the point. At bottom, the totality of the circumstances, especially the nature of the

14

questioning, make clear that a reasonable person in Mr. Kandic's place would not have felt free to leave.

The custodial interrogation was not preceded by <u>Miranda</u> warnings. Indeed, the only warning given – "Kandic was advised that it was necessary to be truthful and that lying to the FBI conducting an investigation is a felony" – actually presumed speech and completely undermined the preeminent right of <u>Miranda</u>: the right to be silent. As such, the statements allegedly made by Mr. Kandic on July 18 should be suppressed.

<u>July 25, 2017</u>

Mr. Kandic was clearly in custody when he was interviewed (for nearly 3 hours) by U.S. agents while detained in Sarajevo on local charges. He was also interrogated. The agents' introductory remarks were clearly designed to elicit incriminating responses. The agents cited portions of the complaint and itemized some additional evidence they had that supported the charges, including Mr. Kandic's use both of online/mobile messaging accounts and forged travel documents. They went on to indicate their awareness of his facilitation and funding of the suicide bomber Jake Bilardi and others. They even directly questioned whether Mr. Kandic believed Bilardi was mentally disabled. In addition, the agents made statements about the benefits of cooperation. Specifically one requested "some information as a good faith gesture so that in return [the agent] can tell his colleagues, inform the prosecutor,

15

and discuss different ways of cooperation." In sum, the agents confronted Mr. Kandic with incriminating information and asked for a statement. Controlling case law establishes this as interrogation. See Szymaniak, supra.

Given that Mr. Kandic was in custody, he should have received Miranda warnings in advance of the interrogation, but did not. Instead he was merely told that he was not obligated to speak to them and that he could speak privately with the defense counsel provided by the court of Bosnia and Herzegovina. At the very least, this instruction omits the necessary instruction that if he were to speak, "anything he says may be used against him in a court of law." And, while he was perhaps technically "represented" by an attorney, she was appointed by a court in Bosnia and Herzegovina and cannot have known anything about the laws of the United States generally, let alone the Fifth Amendment or Miranda and its progeny specifically. Indeed, she could understand the agents only with the aid of a translator.[3]

For the foregoing reasons, the advice of rights was patently

---

[3]

Were Mr. Kandic physically in the United States this would not have happened. He would have appeared before a Magistrate Judge, with a qualified defense attorney, and he would have been provided warnings as to statements to law enforcement, by both. Moreover, in local Districts, even material witnesses are generally provided qualified counsel to advise them before speaking to federal agents or prosecutors. Referencing footnote five, post, the government must concede this point. In questioning Mr. Kandic in Saravejo, the government skirted procedural norms in an effort to obtain an unfair advantage.

inadequate and the statements allegedly made by Mr. Kandic should be suppressed.

### July 26, 2017

For similar reasons, statements elicited at the July 26, 2017 (continued) interview should be suppressed.  Mr. Kandic was still in custody and he was interrogated.  In the later regard, the EDNY AUSA handling the criminal case in the United States addressed Mr. Kandic and told him that he had just two choices: cooperation or trial,[4] it was emphasized that Mr. Kandic "should consider the time sensitive aspect of the information he may possess, particularly with regard to any possible threat information, because that could benefit him in his cooperation with the FBI/EDNY."  With good reason, these types of comments have been deemed to constitute interrogation.  Campaneria v. Reid, supra.

Although the advice of rights provided was slightly more fulsome than that provided the day before,[5] it still failed to include the warning that any statements made could be used against him in a court of law.

---

[4] This omits the most frequent resolution of cases, to wit, plea agreement without cooperation.  It also omits a plea to the indictment, but that can perhaps be forgiven given that such a plea would result in lifetime imprisonment.  The defense attorney present would not likely have known of these possible alternative resolutions.

[5] Mr. Kandic was informed that "if this interview were to be conducted in the United States, he would be provided with an attorney to represent his interests."

17

For the foregoing reasons, statements allegedly made on July 26 should also be suppressed.

## CONCLUSION

For the foregoing reasons, statements allegedly made by Mr. Kandic to law enforcement on March 27 and July 18, 2012, and on July 25 and 26, 2017, should be suppressed.  In the alternative, a hearing should be ordered.


Dated:      New York, New York
            September 6, 2019


                        Respectfully submitted,

                        JAMES M. BRANDEN, ESQ.
                        BOBBI C. STERNHEIM, ESQ.

                            Attorneys for Defendant
                            MIRSAD KANDIC


              By        _____
                        JAMES M. BRANDEN
                        Bar No. JMB 4007

18