UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

MIRSAD KANDIC,

Defendant.

**MEMORANDUM & ORDER**

**17-CR-449 (NGG) (RER)**

NICHOLAS G. GARAUFIS, United States District Judge.

Defendant Mirsad Kandic is charged with six violations of 18 U.S.C. § 2339B(a)(1) for conspiring to provide, providing, and attempting to provide a wide range of material support and resources to the Islamic State of Iraq and al-Sham ("ISIS"). Pending before the court is the government's omnibus motion *in limine* requesting pretrial rulings on several anticipated evidentiary issues. (*See* Gov't Mot. (Dkt. 214); Def.'s Opp'n (Dkt. 230).) For the reasons that follow, the government's motion is GRANTED in full, subject to certain issues on which decision is reserved until trial unfolds.

## I.   BACKGROUND[1]

The government intends to prove the following at trial:

From approximately 2013 to 2017, Mirsad Kandic conspired to provide, provided, and attempted to provide material support to ISIS, while Kandic was located in Syria, Turkey, and Bosnia and Herzegovina. (*See* Gov't Mot. at 2; *see generally* Indictment (Dkt. 4).)

---

[1] The following summary of facts the government intends to establish is based on the allegations set forth in the Complaint (Dkt. 1), the Indictment (Dkt. 4), and, primarily, the government's memoranda in support of its motion *in limine* (Dkts. 214, 246). This information provides context in deciding the pending motion.

1

Before joining ISIS, Kandic, born in Kosovo, moved to the United States in 2003, where he became a lawful permanent resident, living in the Bronx and Brooklyn for about ten years. (*See* Gov't Mot. at 2; Compl. ¶ 2.) In the early 2010s, he began to make a concerted effort to depart the United States for the Middle East. (*See* Gov't Mot. at 2.) After two failed attempts to reach the Middle East from New York and Toronto, Kandic arrived in Turkey in late 2013 via a circuitous route—first across the border to Monterrey, Mexico, then to Panama City, Panama, then to Sao Paolo, Brazil, and finally to Istanbul, Turkey. (*See id.*; Compl. ¶ 6.) From there, he crossed into Syria, where he joined ISIS and was observed at an ISIS encampment armed with an automatic rifle. (*See* Gov't Mot. at 2.)

The government anticipates establishing that, after providing support to ISIS in Syria for some time, Kandic relocated to Istanbul to support ISIS through other means. (*Id.* at 2-3.) That support included roles in ISIS's "media" and "hijra" (or travel) departments. (*Id.*) These jobs intertwined. In the media department, Kandic operated numerous Twitter accounts to disseminate ISIS propaganda, to urge individuals in the United States and elsewhere to heed ISIS's call to action, to praise those who did, and to recruit supporters. (*Id.*) In the hijra department, he advanced those recruiting efforts by facilitating travel to assist foreign fighters in reaching the Middle East and joining ISIS. (*Id.* at 3.) This assistance also took other forms. The government alleges that Kandic manufactured and provided false documentation and identification documents to prospective foreign fighters, supporters, and family members; and he assisted with smuggling property, equipment, and money for ISIS and its members. (*Id.*)

The government intends to prove that among the foreign fighters Kandic recruited and assisted in joining ISIS was Jake Bilardi. (*Id.*) Specifically, in August 2014, he facilitated Bilardi's travel

from Melbourne, Australia to Istanbul, and then onto ISIS-controlled territory in Syria. (*Id.*) Kandic used Twitter messages to instruct Bilardi on what to do (and what not to do) upon arrival in Istanbul, and on what items to bring (and not to bring) on his travels. (*See id.*) After Bilardi joined ISIS, he and Kandic continued to communicate; Kandic encouraged Bilardi to carry out a violent attack, which culminated in March 2015 with a suicide truck bombing near Ramadi, Iraq. (*Id.*; Compl. at 12-18.) Kandic praised the bombing on Twitter and to an associate in the aftermath. (*See* Gov't Mot. at 3.)

In January 2017, Kandic used a fraudulent passport to relocate from Turkey to Sarajevo, where Bosnian authorities arrested him about six months later. (*Id.*) Those authorities seized his cell phone, which contained private communications with alleged ISIS co-conspirators on various encrypted communications platforms; they also searched his apartment and recovered false passports, including the passport that he used to enter Bosnia. (*Id.* at 3-4.) Following his arrest, Kandic was extradited to the United States, where a grand jury in the Eastern District of New York returned an Indictment against him charging six counts in violation of 18 U.S.C. § 2339B(a)(1):

Count 1: Conspiring to provide material support and resources, including property, services, and personnel (including himself, Jake Bilardi, and others) to ISIS, a foreign terrorist organization engaged in terrorist activity and terrorism—and the offense resulted in the death of one or more persons, including Jake Bilardi. (Indictment ¶¶ 5-6.)

Count 2: Providing and attempting to provide material support and resources in personnel (himself and others) to ISIS. (*Id.* ¶¶ 7-8.)

Count 3: Providing and attempting to provide material support and resources in services to ISIS. (*Id.* ¶¶ 9-10.)

Count 4:    Providing and attempting to provide material support and resources in property and equipment to ISIS. (*Id.* ¶¶ 11-12.)

Count 5:    Providing and attempting to provide material support and resources in personnel (Jake Bilardi) to ISIS—and the offense resulted in the death of Jake Bilardi. (*Id.* ¶¶ 13-14.)

Count 6:    Providing and attempting to provide material support and resources in false documentation and identification to ISIS. (*Id.* ¶¶ 15-16.)

The government now moves *in limine* requesting several evidentiary rulings to support these charges. Trial is set to begin May 3, 2022.

## II.  DISCUSSION

The government seeks to admit other act evidence under Rule 404(b) about Kandic's circuitous travel and use of a fraudulent passport to enter the United States; to admit categories of co-conspirator statements made in furtherance of the conspiracy; to admit ISIS propaganda material that Kandic allegedly posted on Twitter or that he possessed on his cellphone, email and social media accounts; to admit deposition testimony taken pursuant to Federal Rule of Criminal Procedure 15 with certain witness protection measures; to admit certain business records pursuant to self-authenticating certifications; and to preclude evidence and argument about possible punishment. The government also seeks permission to use certain measures to protect the identities of an Undercover Law Enforcement Officer and a Confidential Informant, and to preclude specific lines of inquiry on cross-examination.

The court addresses each issue in turn. As described below, however, Kandic opposes some of these motions in full, others in part,

4

and some not at all. Still others require further development at trial before the court can rule on them; decision on such issues are thus reserved for trial. *See United States v. Pugh*, 162 F. Supp. 3d 97, 100-01 (E.D.N.Y. 2016) ("A court considering a motion *in limine* may reserve judgment until trial in order to place the motion in the appropriate factual context."). [2] Save for those reserved issues, though, the government's motion is GRANTED in full.

### A.  Other Act Evidence

Ten years prior to the charged conduct, in 2003, Kandic arrived in the United States and applied for asylum. The government proffers that, during his asylum interview, Kandic explained that he was smuggled from Montenegro, through Bosnia, Croatia, and Slovenia, and finally to Austria, which he entered through a forested border area. Once there, he procured a fraudulent Slovenian passport which he used to fly to Washington, D.C. The government seeks to admit this as other act evidence pursuant to Rule 404(b). That request is GRANTED.

### 1.    Legal Standard

The Second Circuit applies an "inclusionary approach" to the admission of other-act evidence, "allowing the admission of such evidence for any purpose other than to show a defendant's criminal propensity, as long as the evidence is relevant and satisfies the probative-prejudice balancing test of Rule 403." *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000). Before admitting other-act evidence then, the court considers whether it is: "(1) advanced for a proper purpose; (2) relevant to the crime for which the defendant is on trial; (3) more probative than prejudicial; and, (4) if requested, admitted with [a] limiting instruction to the jury." *United States v. Ramirez*, 894 F.2d 565, 568 (2d Cir.

---

[2] When quoting cases, and unless otherwise noted, all citations and quotation marks are omitted, and all alterations are adopted.

1990) (citing *Huddleston v. United States*, 485 U.S. 681, 691-92 (1988)).

### 2.    Application

The government contends it should be permitted to admit evidence of Kandic's irregular border crossings and procurement of false documentation under Rule 404(b) to show preparation, knowledge, absence of mistake, and lack of accident. (Gov't Mot. at 8-10.) Kandic responds that the government's purpose is little more than pretext to establish his propensity to engage in crime and behave fraudulently, in part, because no one would think that sending someone to Syria to fight for ISIS is done by accident or without knowledge of illegality. (Def.'s Opp'n at 2.) Kandic is correct that absence of mistake and lack of accident are not proper purposes to admit this evidence—nothing about these facts suggest the possibility of accidental or innocent involvement, being duped, or used. Nor is preparation a proper purpose—the uncharged conduct lacks any overarching design or purpose that Kandic consciously developed in being smuggled into the United States to possibly use that experience ten years later. Knowledge, however, represents a proper purpose to advance the proffered evidence. *See* Fed. R. Evid. 404(b)(2).

"The defendant's knowledge may be in issue when the crime he or she is charged with having committed involves the use of knowledge or expertise that is not available to the average person with the level of the defendant's education and experience." 1 Weinstein's Evid. Manual § 7.01 (2022) (citing, *e.g.*, *United States v. Ramos-Atondo*, 732 F.3d 1113, 1123-24 (9th Cir. 2013) (in marijuana smuggling prosecution, admitting defendant's prior conviction for alien smuggling to show defendant's knowledge of cross-border smuggling procedures)); 1 Mueller and Kirkpatrick, Fed. Evid. § 4:34 (4th ed.) (explaining that knowledge sometimes refers to "possession of information or sometimes capability," and noting that other acts may therefore "show that

the defendant performed certain tasks requiring technical knowledge or skill, . . . in which case the prior acts support an inference that he had the ability or capacity to perform similar tasks in connection with the charged offense") (citing, *e.g.*, *United States v. Walters*, 351 F.3d 159, 166-67 (5th Cir. 2003) (admitting portions of *The Anarchist's Cookbook* to show the defendant's knowledge and ability to build a bomb)).

Here, Counts Two and Five charge Kandic with providing and attempting to provide material support in the form of personnel (himself and others) to ISIS. Count Six charges him with providing material support and resources in the form of false documentation and identification to ISIS. These charges require the government to show that Kandic facilitated the travel of foreign fighters (himself included) from various locations to reach ISIS-controlled territory in Syria and elsewhere. Evidence that Kandic, based on personal experience, knew how to successfully navigate international borders is therefore offered for a proper purpose: his knowledge. So too is evidence that Kandic had the ability to procure a fraudulent, serviceable passport in a foreign country. Accordingly, the court agrees with the government that "[s]muggling and procuring false documentation require specific skills and specialized knowledge," and the proffered evidence demonstrates that Kandic had that skill and knowledge. (Gov't Reply (Dkt. 246) at 4-5.)

The proffered evidence is relevant for the same reasons. Evidence of Kandic's prior circuitous border crossing to reach the United States in 2003 is relevant to Counts Two and Five because it informs and contextualizes his later alleged route in 2013, as well as his travel instructions to foreign fighters during the course of the conspiracy. For example, it tends to show why Kandic, after two failed attempts to depart the United States, took a similarly circuitous route to reach ISIS-controlled territory, crossing the border into Mexico, then flying to Panama, then Brazil, and later

to Turkey. The peculiarity of such indirect travel also overcomes much of the temporal remoteness of this evidence.[3] In addition, Kandic's demonstrated ability to procure fraudulent travel documents in a foreign country is relevant to Count Six because it suggests a know-how about where to go and whom to contact to later procure such resources. The proffered evidence is therefore relevant. Moreover, its probative value is not outweighed by unfair prejudice—particularly when compared to the other charged conduct. *See United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990) (affirming admissibility of Rule 403 balancing test where other-acts evidence "did not involve conduct any more sensational or disturbing than the crimes . . . charged"); *United States v. Ulbricht*, 79 F. Supp. 3d 466, 481 (S.D.N.Y. 2015) (collecting cases). That said, the court recognizes that admission of this evidence can generate significant prejudice. It evokes an ugly canard of the asylum seeker turned criminal. The government should therefore take pains to admit this evidence only as warranted—and only for the purposes described in this opinion, that is, to show Kandic's knowledge and ability to get himself and others from Point A to Point B, where Point B is ISIS-controlled territory. To that end, Kandic, if he wishes, may request a limiting instruction concerning the purpose for which this evidence is being offered.

## B.  Co-Conspirator Statements

"Rule 801(d)(2)(E) states that out-of-court declarations are not excludable as hearsay if they are made by a co-conspirator of a party during the course and in furtherance of the conspiracy."

---

[3] The Complaint provides additional evidence to overcome staleness. It describes an interview with a cooperating witness, who stated that Kandic expressed a desire to engage in jihad and discussed the possibility of taking a "smuggler's route" to a war zone once he arrived in Europe or Iran. (*See* Compl. ¶ 5.) According to this cooperator, this conversation occurred "several years" after he first met Kandic in or about 2005. (*See id.* ¶¶ 4-5.)

*United States v. Farhane*, 634 F.3d 127, 161 (2d Cir. 2011). "To admit an out-of-court declaration under this rule, the district court must find by a preponderance of the evidence '(a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that the statement was made during the course of and in furtherance of the conspiracy.'" *Id.* (quoting *United States v. Al-Moayad*, 545 F.3d 139, 173 (2d Cir. 2008)).

The government moves to admit various categories co-conspirators' statements pursuant to Rule 801(d)(2)(E). Generally, it seeks to admit communications (written messages and audio-recorded voice memos) of two types: (1) communications between Kandic and people the government identifies as his co-conspirators, and (2) communications between those co-conspirators and other third parties. These communications, the government explains, include inculpatory statements about Kandic's and his alleged co-conspirator's roles in ISIS and the support they provided to ISIS. (*See* Gov't Mot. at 10-12.) Kandic contests only the high level of generality of the government's category-based motion. (*See* Def.'s Opp'n at 2-3.) Indeed, where the government offers three specific examples of co-conspirator statements, Kandic offers no objection, assuming the foundational requirements are met. (*See id.* at 3.) The government, in its reply, explains the breadth of its opening motion as a means to inform the court of the categories of statements that it expects to introduce at trial. (*See* Gov't Reply at 5.) It thus asks the court to admit the unobjected to examples and to reserve on the remainder. (*Id.* at 5-6.)

The court agrees that the proposed categories of evidence and the unobjected to examples, as the government describes them, likely satisfy Rule 801(d)(2)(E). But the court declines to resolve any particular evidentiary admission until trial. In doing so, the

court will follow the *Geaney* protocol. *See United States v. Ferguson*, 676 F.3d 260, 273 n.8 (2d Cir. 2011). "Under that protocol, 'statements proffered as coconspirator statements may be admitted in evidence on a conditional basis, subject to the later submission of the necessary evidence' establishing 'that a conspiracy existed, that the defendant and declarant were members, and that the statements were made during the course of and in furtherance of the conspiracy.'" *United States v. Loera*, No. 09-CR-0466 (BMC), 2018 WL 2744701, at *6 (E.D.N.Y. June 7, 2018) (quoting *United States v. Tracy*, 12 F.3d 1186, 1199 (2d Cir. 1993)). Therefore, decision on the government's motion to admit certain categories of co-conspirator statements is RESERVED until trial, at which the government must establish by a preponderance of the evidence each requirement under Rule 801(d)(2)(E).[4]

### C.   ISIS Propaganda Evidence

The government seeks to admit portions of the voluminous "ISIS Propaganda Evidence" recovered from (1) a cell phone seized from Kandic during his arrest in Bosnia, and (2) his social media and email accounts. Kandic concedes that propaganda videos are relevant. (*See* Def's Opp'n at 1 (noting the "fulsome body of Second Circuit case law . . . authorizing . . . the admission of propaganda materials disseminated by terrorist groups that are later found in the possession of a defendant charged with materially supporting such groups"). It is a sensible concession given that the Second Circuit has regularly allowed terrorist propaganda to be admitted in material support cases. *See Pugh*, 162 F. Supp. 3d at 114 (citing, *e.g.*, *United States v. Kaziu*, 559 Fed. App'x. 32, 35 (2d Cir. 2014) (summary order); *United States v.*

---

[4] The government may separately move at trial to admit statements at issue under the specific hearsay exceptions through Rules 803 (*e.g.*, statement of then-existing mental conditions) and 804 (*e.g.*, statement against penal interest). *See* Fed. R. Evid. 803(3), 804(b)(3).

*Abu-Jihaad*, 630 F.3d 102, 133-34 (2d Cir. 2010)), *aff'd*, 945 F.3d 9 (2d Cir. 2019). He therefore opposes this evidence primarily on Rule 403 grounds for cumulativeness and piling on. (*See* Def.'s Opp'n at 1, 3-4.)

The government, in its reply, has provided a list of videos it intends to offer at trial. (*See* Gov't Reply at 8-10.) Together these videos run about one hour, from about 10 hours of material the government obtained. (*See id.* at 10.) Kandic subsequently had the opportunity to respond to these specified videos. (*See* April 20, 2022 Order; Def.'s Sur-Reply (Dkt. 253).) Although he reserves the right to renew his objection based on Rule 403 grounds at trial, he now opposes only two of those videos: GX 1310D and GX 1317D. (*See* Def's Sur-Reply at 1-3.) Kandic is right about GX 1310D; it clearly depicts a severed head at the end of the video, and the court concludes this portion of the video is more unfairly prejudicial than probative. Therefore, to the extent the government intends to use this video, it must omit that portion.

But GX 1310D represents the exception to the government's proposed list. No other videos present unfair prejudice that outweighs their probative value under Rule 403. This includes GX 1317D, which presents a sleek video production, depicting soon-to-be executed prisoners in orange jumpsuits which cuts away with ample time before the executions. This is a terrorism case; "it is inescapable . . . that there will be some evidence about violence and terrorist activity." *Pugh*, 162 F. Supp. 3d at 117-18 (citing *United States v. El-Mezain*, 664 F.3d 467, 511 (5th Cir. 2011)). And given the nature of this terrorism case—Kandic's alleged role in ISIS's media department, his recruitment efforts, and the charged conspiracy to provide a wide range of material support and resources in Count One—the propaganda evidence is especially relevant to the allegations at issue. *See id.* at 116 ("[C]ourts are more likely to admit terrorist propaganda material

when it bears a direct relationship to the allegations at issue in the trial.").

These videos represent the tools of Kandic's alleged trade to promote ISIS's broader strategy and recruit additional supporters. While he is correct that the videos found on his cell phone are less relevant to the videos posted on Twitter and elsewhere, those videos too remain highly relevant. They informed Kandic about ISIS's objectives; educated him about what messages to broadcast and to whom he should broadcast them; and supported his overall recruiting efforts. The more propaganda he consumed, the better he performed his job. And, as the government explains, the videos are relevant to several elements of the charged offenses, including Kandic's intent to provide material support to ISIS as a propagandist and recruiter, and his knowledge that ISIS was a terrorist organization engaged in terrorist activity and terrorism. (*See* Gov't Reply at 10-12.) Therefore, the ISIS propaganda material is admitted. The government is entitled to prove its case with evidence of its choosing, *see Old Chief v. United States*, 519 U.S. 172, 189 (1997), and the government alleges that Kandic possessed, viewed, and used these videos in his support of ISIS. This evidence therefore "speaks directly" to the charged conduct. *See Pugh*, 162 F. Supp. 3d at 117-18. The government's motion to admit propaganda evidence is therefore GRANTED.

Notwithstanding this ruling, if the presentation of these videos at trial becomes repetitive or fails to connect the evidence to the charged conduct, *i.e.*, through appropriate witnesses placing the evidence in its appropriate context, then Kandic may renew his objection for cumulativeness and piling on, and the court will reconsider his motion in the context of trial. *See Luce v. United States*, 469 U.S. 38, 41 (1984). Put another way, the back-to-back presentation of multiple videos depicting very similar scenes may

cause the videos to lose some of their probative value on the second, third, or fourth play if not properly contextualized. In that case, a recalibrated Rule 403 analysis may counsel limitation on what videos are played, and which are more appropriately admitted through narrative testimony.

Finally, to the extent the risk of unfair prejudice arises at trial, the court will issue an appropriate limiting instruction at the appropriate time and at Kandic's request. *See Abu-Jihaad*, 630 F.3d at 134 (a proper limiting instruction minimizes the risk of undue prejudice).[5]

### D. Measures Concerning the Testimony of an Undercover Law Enforcement Officer and a Confidential Informant

The government proffers that, over the course of the charged conduct, Kandic communicated at various times with an FBI undercover agent (the "UC") and an NYPD confidential informant (the "CI"). (*See* Gov't Mot. at 27.) The government intends to offer their testimony, and moves to (1) permit the UC and CI to testify under pseudonyms (agreed to by the parties) rather than disclose their true identities, and (2) preclude Kandic from inquiring into the UC's and CI's true identities, places of residence, location of family, and other investigations unrelated to the defendant or this case. (*Id.* at 28.) Kandic largely agrees to these measures; he consents to using pseudonyms so long as the jury is not made aware of their use, a caveat to which the government agrees. (*See* Gov't Reply at 12.)

---

[5] In addition, if the issue concerning the scope of the propaganda testimony arises at trial as it relates to the resulting death element, (*see* Def.'s Sur-Reply at 3), Kandic may then offer an appropriate limiting instruction, which the government may respond to, and the court will consider the matter at that time.

Kandic objects, however, to the government's reference to "other investigations" and to possibly undisclosed *Brady/Giglio* and 3500 evidence. The government responds that Kandic's request falls outside the bounds of its disclosure requirements, and that he lacks any basis to request investigative materials pertaining to other national security investigations that are unrelated to his case.[6] (*See id.* at 12-13 (citing Order, *United States v. Pugh*, No. 15-CR-116 (E.D.N.Y. Feb. 24, 2016) (Dkt. 99) (granting the government's motion to preclude cross-examination about any ongoing investigations or undercover activities to the extent they are unrelated to the defendant); *United States v. Alimehmeti*, 284 F. Supp. 3d 477, 494 (S.D.N.Y. 2018) (Engelmayer, J.) (granting the government's motion to preclude inquiry at trial into a UC's participation in unrelated matters)). Furthermore, the government represents that it is aware of its discovery obligations, and has and will continue to comply with those obligations. Given this representation, and the government's discovery record in this case, the court agrees with the government and finds Kandic's concerns overstated. Therefore, the government's motion to implement certain measures to protect the identities of the UC and CI and to preclude specific lines of inquiry on examination is GRANTED.

In reaching this conclusion, the court follows Judge Engelmayer's decision in *Alimehmeti* and grants this motion preliminarily, subject to Kandic articulating a basis on which the UC's or CI's work on other matters would be relevant here. *See* 284 F. Supp. 3d at 494-95.

---

[6] The government is reminded that it must also consider the scope of the charged conspiracy in Count One when reviewing whether national security investigative materials do or do not pertain this case.

### E.  Rule 15 Deposition Testimony and Certain Witness Protection Measures

The government moves to admit two depositions of overseas witnesses pursuant to Federal Rule of Criminal Procedure 15. Because the Federal Rules of Evidence govern the use of all or part of a Rule 15 deposition at trial, *see* Fed. R. Crim. P. 15(f), such testimony is typically admitted pursuant to the former testimony exception to the hearsay rule under Rule 804(b)(1). *See, e.g.*, *United States v. Salim*, 855 F.2d 944, 952 (2d Cir. 1988). The former testimony exception to the hearsay rule permits deposition testimony of an unavailable witness to be "offered against a party who had . . . an opportunity and similar motive to develop it by" cross-examination. Fed. R. Evid. 804(b)(1). The government contends, and Kandic does not dispute, that the two depositions meet the criteria under Rule 804(b)(1). This court has previously found each deponent-witness unavailable to testify in person at trial, and the depositions were taken lawfully.[7] Accordingly, this motion is GRANTED, and the Rule 15 depositions are ADMITTED under Rule 804(b)(1).

Because the depositions were transcribed and videorecorded, the government intends to present this evidence by playing the videorecordings and simultaneously providing the jury with transcripts of the depositions as an aid. The government also proposes redacting identifying information of the witnesses from the transcripts made available to the public. The government has

---

[7] For each deposition, counsel for the government and counsel for the defendant were present in-person at the overseas location, with the proceedings live-streamed to a courtroom in the Eastern District of New York where Kandic, additional defense counsel, and additional government counsel were present, and Magistrate Judge Ramon E. Reyes, Jr. presided. During each deposition, the witness was placed under oath, the government conducted a direct examination, and the defense conducted a cross-examination.

previously set forth the bases for keeping the deposition wit-
nesses' identities under seal, and the court has done so. (*See* Feb.
25, 2020 Order (Dkt. 76); Jan. 6, 2022 Order (Dkt. 164).) Kandic
does not object to these public-facing protections.[8] Kandic none-
theless questions whether the deponent-witnesses testified in
open court elsewhere without the requested precautions. The
government answers that neither of the two deposition witnesses
has previously testified in open court under their true names.
Witness 1's cooperation did not involve courtroom testimony;
Witness 2's testimony in foreign courts utilized measures to pro-
tect Witness 2's identity. The government asserts that it
confirmed each of these with Witness 1's and Witness 2's respec-
tive home countries. Even if these witnesses did testify in open
court elsewhere, the government has offered sufficient reason to
keep their identities under seal, to which the court has agreed,
and Kandic offers no countervailing reason to disturb this ruling,
particularly when the deposition testimony will be presented
completely to the jury in its original form. Therefore, the govern-
ment's proposed procedure to present this deposition testimony
and to keep the deponent-witnesses' identities under seal is
GRANTED.

### F.   Business Records Certificates

The government moves to admit evidence pursuant to business
records certifications, thus alleviating the need for testimony
from more than 10 records custodians. The government has pro-
vided the relevant certificates under seal, the court has reviewed
them, and Kandic does not object to their use. The government

---

[8] Kandic objected to redacting identifiable information or blurring images
of the witnesses to the jury. The government affirmed that it does not in-
tend to alter, blur, or pixelate the likeness of the witnesses in the video
shown to the jury, or to redact identifying material in the transcripts pro-
vided to the jury. The government proposes these steps only as public-
facing measures, which will send no extraneous messages to the jury.

is thus permitted to authenticate and admit travel records, email and social media account records, bank records, and other business records, both foreign and domestic, using self-authenticating documents pursuant to 18 U.S.C. § 3505 and Federal Rule of Evidence 902(11). *See, e.g.*, *United States v. Komasa*, 767 F.3d 151, 154-56 (2d Cir. 2014).

### G. Evidence and Argument Concerning Possible Penalties

The government moves to preclude evidence and argument regarding the punishments that the defendant may face if convicted on one or more counts at trial. Kandic does not object. *See*, *e.g.*, *Shannon v. United States*, 512 U.S. 573, 579 (1994) ("Information regarding the consequences of a verdict is . . . irrelevant to the jury's task."). This motion is therefore GRANTED.

## III. CONCLUSION

For the reasons stated above, the government's [214] motion is GRANTED in full, subject to certain issues on which decision is RESERVED until trial unfolds.

SO ORDERED.

Dated:    Brooklyn, New York
          April 28, 2022

                              /s/ Nicholas G. Garaufis
                              NICHOLAS G. GARAUFIS
                              United States District Judge

17