UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    -against-

MIRSAD KANDIC,

              Defendant.

**MEMORANDUM & ORDER**
17-CR-449 (NGG) (RER)

NICHOLAS G. GARAUFIS, United States District Judge.

Defendant Mirsad Kandic moves to admit sworn out-of-court statements from Jake Bilardi's siblings made to Australian law enforcement which, he argues, establish that Bilardi was radicalized well before he met Kandic. In particular, Kandic seeks to admit the partially redacted affidavits of Bree-Anna and Jesse Bilardi. He also moves to permit Armando Cordoba, an Australian journalist hired by the Bilardi family to find Jake, to testify about information told to him by the Bilardis and others.

For the reasons that follow, Kandic's motion to admit the proffered statements, either through the sworn affidavits or through Mr. Cordoba, is DENIED.

## I. BACKGROUND

The court assumes familiarity with the underlying facts and history of this case. (*See* Mem. & Order (Dkt. 266) at 1-4; Am. Mem. & Order (Dkt. 280) at 1-2.)

Mirsad Kandic is charged with six violations of 18 U.S.C. § 2339B(a)(1) for conspiring to provide, providing, and attempting to provide a wide range of material support and resources to the Islamic State of Iraq and al-Sham ("ISIS"). His jury trial started on May 3, 2022. That evening, he moved to admit sworn affidavits from Bree-Anna, Chris, and Jesse Bilardi made to Australian Federal Police. (*See* Def.'s Mot. (Dkt. 278).) The

government opposed, (*see* Gov't Opp'n (Dkt. 286)), and the parties discussed the issue in court on May 10, 2022, (*see* Trial Tr. at 926-27, 930-39). That evening, Kandic filed a reply seeking to admit only the affidavits from Bree-Anna and Jesse with redactions addressing concerns about personal knowledge and double-hearsay. (*See* Def.'s Reply (Dkt. 291) at 1.) At the close of proceedings on May 11, 2022, the court denied Kandic's motion on the record. (*See* Trial Tr. at 1108-16.) This Memorandum memorializes and expounds on that ruling.

## II. DISCUSSION

The proffered affidavits are inadmissible hearsay unless an exception to the hearsay rule provides otherwise. *See* Fed. R. Evid. 802. Kandic offers two exceptions based on witness unavailability: Rule 804(b)(1), the former testimony exception, and Rule 804(b)(4), the family history exception. As an alternative, he offers the statements under Rule 807, the residual exception. The court addresses each exception in turn.

### A. Hearsay Exceptions for Unavailable Declarants

#### 1. Unavailability

Unavailability is a condition precedent to admission under the Rule 804 hearsay exceptions. *See* Fed. R. Evid. 804(a). A declarant is considered unavailable if she is absent from the trial. *See* Fed. R. Evid. 804(a)(5). But absence alone is not enough. The proponent of the hearsay statement must show an inability to procure the declarant's attendance or testimony by process or by other means. *See id.* By process means legal process, *e.g.*, by subpoena. So a foreign declarant not within the United States is beyond the reach of process. *See, e.g.*, 28 U.S.C. § 1783(a). Thus, the Bilardi siblings, citizens and residents of Australia, are beyond the legal power of this court. *See Mancusi v. Stubbs*, 408 U.S. 204, 213-14 (1972).

By "other reasonable means" generally requires that the proponent make a good faith effort to procure the declarant's attendance or testimony. *See* 30B Fed. Prac. & Proc. Evid., Wright & Miller § 6968 (2022 ed.) (describing the proponent's duty to act in a "good faith and competent manner"); *cf. United States v. Zuno-Arce*, 44 F.3d 1420, 1425 (9th Cir. 1995) (noting, in the context of a Rule 15 deposition, that the district court "focused appropriately on," *inter alia*, the defendant-movant's "good faith effort to obtain the witnesses' presence at trial" (citing *United States v. Sindona*, 636 F.2d 792, 803-04 (2d Cir. 1980))). Here, counsel for Kandic requested, and the court granted, funds under 18 U.S.C. § 3006A(e)(1) to travel to Australia and hire an Australian investigations firm to learn more about Jake Bilardi and his path to radicalization. Kandic has provided a letter from his investigator describing their attempted and, what they deemed, futile efforts in contacting the Bilardi siblings. (*See* Letter from Paul Walsh, Ex. E (Dkt. 278) at ECF pp. 62-63.) Kandic has reiterated those failed efforts—and the Bilardi family's hostile response to those efforts—on the record. (*See* Trial Tr. at 937-38.) The government has similarly reported that at least one sibling, Bree-Anna, refused to meet with them. (*See id.* at 932.) Thus, relying on the representations of counsel, the court finds that Kandic has discharged his good-faith-effort requirement.[1]

---

[1] The court rejects Kandic's assertion of unfairness or wrongdoing related to when they learned about these affidavits and their subsequent ability to contact the Bilardi siblings. In short, he suggests that the government disclosed these affidavits "on the eve of trial," far too late for them to locate and seek to depose the Bree-Anna, Chris, or Jesse. As described above, though, Kandic has aimed to develop a defense theory focused on Bilardi's radicalization from the very outset of this case, and this court has granted every request to allow him to advance that theory. That he decided against pursuing contact with Bree-Anna, Chris, or Jesse is a problem of his own making, particularly when the court has demonstrated its interest in assisting the parties with preparing for this largely extraterritorial case. For

Accordingly, the Bilardi siblings are unavailable under Rule 804(a)(5). Still, the proffered statements fall outside the proposed hearsay exceptions for former testimony and family history.

### 2. Former Testimony

"Nothing in the language of Rule 804(b)(1) suggests that a court may admit former testimony absent satisfaction of each of the Rule's elements." *United States v. Salerno*, 505 U.S. 317, 321 (1992).[2] Thus, the proffered statements fail to satisfy the former testimony exception because the sibling affidavits are not from a trial, hearing, or lawful deposition, and because the government had no opportunity to develop the proposed testimony by cross-examination as required under the rule. *See* Fed. R. Evid. 804(b)(1).

### 3. Family History

#### a. *Legal Standard*

Rule 804(b)(4) permits statements about "the declarant's own birth, adoption, legitimacy, ancestry, marriage, divorce, relationship by blood, adoption, or marriage, or similar facts of personal or family history, even though the declarant had no way of acquiring personal knowledge about that fact," or a statement about "another person concerning any of these facts, as well as death, if the declarant was related to the person by blood." *See* Fed. R. Evid. 804(b)(4). This exception "assumes that statements of family history are likely to be informed by knowledge shared in common among family members on the basis of customs and

---

instance, aside from defense counsel's investigative trip to Australia, the court has permitted two overseas depositions (in two different continents) under Rule 15.

[2] When quoting cases, and unless otherwise noted, all citations and quotation marks are omitted, and all alterations are adopted.

understandings that are likely to be true," and thus represents a category of statements deemed "'free enough from the risk of inaccuracy and untrustworthiness' such that 'the test of cross-examination would be of marginal utility.'" *Porter v. Quarantillo*, 722 F.3d 94, 98 (2d Cir. 2013) (quoting *Idaho v. Wright*, 497 U.S. 805, 819-20 (1990)).

Kandic relies primarily on the Second Circuit's analysis of the "similar facts" catchall category in *Porter v. Quarantillo*, 722 F.3d at 98. There, the plaintiff, Porter, sought to prove that he was entitled to derivative U.S. citizenship as of his birth because his mother was a U.S. citizen—a consequence of her being born in the United States and remaining here for over a year before she relocated. *See id.* at 96-97. To establish his derivative citizenship (and possibly entitling him to proceeds from a settlement fund), Porter sought to admit sworn affidavits from his mother and other family members about his mother's age at the time she left the United States. *See id.* (citing his mother's sworn statement that, "[w]hen I was between one year old and two years old, I moved [from Brooklyn] to St. Vincent and the Grenadines"). But neither age nor change in residence is defined under the family history exception, so Porter relied on the "similar facts" catchall. *See id.* at 98.

In considering the scope of this undefined category, the Second Circuit presumed, as instructed by the Supreme Court, that "the drafters of the Rules intended to adhere to the common law in the application of evidentiary principles," and "[a]t common law, the scope of the [family history] exception . . . was defined by the following question":

> Were the circumstances named in the statement such a marked item in the ordinary family history and so interesting to the family in common that statements about them in the family would be likely to be based on fairly accurate knowledge and to be sincerely uttered?

5

*Id.* (citing 5 Wigmore on Evidence § 1502, p. 400 (J. Chadbourn rev. 1974)). Within that framework, the court held that the mother's affidavit "fail[ed] satisfactorily to explain how the precise date of relocation was sufficiently significant or interesting or unusual such that it ever became—much less remained for more than eighty years—a subject of presumptively accurate family lore." *Id.* The court went on to observe that "although a change in one's country of residence or in one's citizenship might, like the date of one's birth, death, or marriage, be a matter of interest within a family, the district court was properly skeptical." *Id.* at 98-99.

### b. *Application*

Kandic argues that the statements from the Bilardi siblings fall within the "similar facts of personal or family history" catchall because the circumstances involving their brother's path to ISIS represent a "matter of interest" within the family. (*See* Def.'s Mot. at 5-6.) True enough, but these statements, wide-ranging and detailed, describe information different in kind from the sort of one-off and linear events covered within the exception, *e.g.*, birth, death, or marriage. *See* Fed. R. Evid. 804(b)(4); *Porter*, 722 F.3d at 98 (considering whether family information fell within the "similar facts" catchall by, *inter alia*, comparing the proffered information to the listed categories of the family history exception). Searing as this information may be for the Bilardi siblings, it is not the kind of family history that gets passed down generationally, such that it would establish a family lore, custom, or tradition that offers presumptive reliability. Moreover, given the intensely personal narrative detailed in these statements—made by declarants whose motivations, the government argues, raise credibility questions—it cannot be said that these statements are "free enough from the risk of inaccuracy and untrustworthiness such that the test of cross-examination would be of marginal utility." *See Porter*, 722 F.3d at 98; *see also Rassano v. Immigr. &*

*Naturalization Serv.*, 377 F.2d 971, 973 (7th Cir. 1966) (explaining that the family history exception offers "inherent trustworthiness" because it covers matters that "a person has little reason to lie about"). Thus, the proffered statements fall outside the scope of the family history exception.

For the reasons stated above, the proffered statements are not admissible under Rules 804(b)(1) or 804(b)(4).

### B. Residual Hearsay Exception

That leaves the residual hearsay exception under Rule 807. This exception allows otherwise inadmissible hearsay to be admitted, if the statement is (1) "supported by sufficient guarantees of trustworthiness—after considering the circumstances under which it was made and evidence, if any, corroborating the statement," and (2) "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807. The Second Circuit breaks this exception down to five requirements: hearsay evidence is admissible if (i) it is particularly trustworthy; (ii) it bears on a material fact; (iii) it is the most probative evidence addressing that fact; (iv) its admission is consistent with the rules of evidence and advances the interests of justice; and (v) its proffer follows adequate notice to the adverse party. *United States v. Dawkins*, 999 F.3d 767, 791 (2d Cir. 2021); *see also United States v. Harwood*, 998 F.2d 91, 98 (2d Cir.1993).

The proffered statements, even in their partially redacted form, fail under the first and third requirements because of lingering trustworthiness concerns and the availability of more probative evidence addressing Jake Bilardi's radicalization process.

First, the proffered statements bear some circumstantial guarantee of reliability as sworn statements made to Australian Federal Police. But these statements are not so trustworthy that cross-examination would be of marginal utility. *See Wright,* 497 U.S.

at 819-20; *see also United States v. Matthews*, 20 F.3d 538, 545 (2d Cir. 1994) ("If the statement does not fall within a firmly rooted hearsay exception, there is a presumption against its trustworthiness."). They offer a retelling of a complex narrative about the dynamics of a dysfunctional family made during an especially traumatic period. And the Bilardi siblings' apparent unwillingness to testify, be deposed, or even interviewed undermines the trustworthiness of that narrative. Moreover, the government offers at least sufficient reason to question whether the siblings harbored any motive to provide half-truths during their interviews. (*See* Gov't Opp'n at 5; Trial Tr. at 931-32.) As a result, these statements would benefit from cross-examination because adversarial testing would bolster their reliability. *See Wright*, 497 U.S. at 821.

Second, Kandic asserts that the proffered affidavits "are the best evidence of Jake's radicalization process," that "[t]here is no other source that tells the story," and, "[w]ithout [these statements], the jury will have a distorted picture of when Jake Bilardi radicalized." (*See* Def.'s Reply at 5, 7.) That simply is not true. The evidence admitted and developed during trial has made it clear that these unexamined hearsay statements are not the most probative evidence addressing Jake Bilardi's path to radicalization before meeting the defendant. There is significant direct and circumstantial evidence that tells that story, including:

- Twitter messages between Jake Bilardi and his sister, Sarah Sans, that discuss Bilardi's mother dying, his difficult childhood, and that he may suffer from a mental illness. (*See* Def.'s Ex. SS-1; Trial Tr. at 985-88.)

- Evidence from the same conversation that Bilardi "studied Islam in Australia" and that is "why [he] came [to Syria]." (*See* Def.'s Ex. SS-1; Trial Tr. at 986.) Other evidence that Bilardi regularly attended the Hume Islamic Youth Centre, which Kandic circumstantially linked to violent extremism. (*See* Trial Tr. at 953-56.)

- Photographs from Jake Bilardi's room that show bookshelves replete with Islamic texts and a cardboard box in his closet containing several jars of the chemical Barium Nitrate. (*See* GX1247.) Kandic also elicited testimony from an Australian Federal Police agent that Barium Nitrate is used almost exclusively to build explosives. (*See* Trial Tr. at 968, 1027-28.)

- Bilardi's cell phone, which contained ISIS-related photographs, including one of Abu Bakr al-Baghdadi. (*See* GX1209; Trial Tr. at 784-86.)

- The authenticated contents extracted from Bilardi's computer, which Kandic may use (and the government has represented that it will not object to its use) during the defense case. (*See* GX1210; Trial Tr. at 909-912, 932.)

- Bilardi's computer contains a vast trove of ISIS propaganda and "mujahideen" material, including video titles like "Stand up and pledge allegiance to Abu Bakr al Baghdadi," "There is No Life Without Jihad," and "Smiling Martyr – Syria," as well as a PDF copy of Sayyid Qutb's book, *Milestones*. (*See* GX1226, 1227.) It also showed that Bilardi ran a search for "turkey-syria border smugglers" on June 1, 2014. (*See* GX1238.)

- A Twitter conversation between Kandic and Bilardi on June 3, 2014, showing an ostensibly early conversation between them, in which Bilardi provides Kandic with background about himself, including that he is "a revert of just over 1 year and [he] recently started learning to read the Qur'an." (*See* GX1222S at 2.)

- A Kik conversation between Bilardi and "Abu Maryam," in which Abu Maryam's profile icon depicts an ISIS flag; Bilardi discusses the "long" list of Islamic books he has read, including that of Muhammad ibn Abdul Wahhabi; and Bilardi tells him that he "reverted about 1.5 years ago." (*See* GX1222G at 4.)

- An 18-minute telephone call between Bilardi and his brother Chris in October 2014, hours before a not-yet-postponed martyrdom operation. Bilardi tells Chris that he had joined the Islamic State, and Chris responds that he "assumed it straight away once you were missing." (GX1206T at 1-2.) Bilardi also tells his brother that he had "been thinking about [joining ISIS] for . . . ages," that he "just decided that [he] wanted to go," and he "got in contact with someone and then" went. (*Id.* at 3.) Bilardi goes on to say that joining ISIS "is something that I've just been thinking about for a long time and . . . I finally decided to do it." (*Id.* at 10.) This phone call shows Bilardi's intention, in his own voice, to join ISIS before contacting this unnamed person.

- A 27-page blog post written by Bilardi in January 2015 in which he discusses his journey to Ramadi. (*See* GX1235A.) This detailed post provides direct evidence from Bilardi about his path—first to Islam, then to extremism, and finally to ISIS. This blog, like the recorded phone call, proves particularly reliable because it falls within a firmly rooted hearsay exception, namely, statements against penal interest. *See* Fed. R. Evid. 804(b)(3); *Wright*, 497 U.S. at 815, 821; *Matthews*, 20 F.3d at 545.

- In that blog post, Bilardi cites the Arab Spring, which occurred in 2010, as the approximate "time that [his] love of the mujahideen began changing from a political admiration to a religious one." (*See* GX1235A at 3.) He writes about his own path to Islam, then radicalization; his desire to make hijra, then his decision to put that desire on hold. He writes in detail about his "Plan B" to carry out an attack that "involved launching a string of bombings across Melbourne, targeting foreign consulates and political/military targets as well as grenade and knife attacks on shopping centres and cafes and culminating with myself detonating a belt of explosives amongst the kuffar." (*Id.* at 5.) Kandic minimizes this blog post as a "symptom of his radicalization" that "does not explain how or when he got to that point," but the blog post, combined with the other information in evidence, does just that, as he demonstrated during his cross-examination of the Australian federal agent. (*See* Trial Tr. at 1001-15, 1019-28.)

- Finally, there is the obvious circumstantial evidence that someone, especially someone like Jake Bilardi from his suburb in Australia, *must* be radicalized to actively plan a lone wolf attack using homemade explosives in one's home country and decide to join ISIS in Syria.

The government proffers that there is additional direct evidence more probative than the proffered statements, including recorded phone calls between Bilardi and his brothers Chris and Jesse. (*See* Trial Tr. at 914, 1000-01; GX1200; Gov't Opp'n at 6 (describing direct statements from Bilardi's "blog, his statements on Facebook and Twitter, recorded calls with his siblings, and the contents of this cellphone and laptop computer").) Given all this information in evidence, and without considering what other discovery exists on this point, it is difficult to understand how

12

Kandic can say that this court, in not admitting these hearsay statements through the residual exception, is somehow "allow[ing] the government to present a materially incomplete and misleading story without the jury understanding how radicalized Jake Bilardi was before he ever met Mr. Kandic." (Def.'s Reply at 7.) No one present in the courtroom could walk away with that impression. Indeed, it seems that the longer trial goes on, and the more evidence that comes in, the clearer it becomes that the sibling affidavits are neither necessary nor the most probative evidence about Jake Bilardi's radicalization. *See Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 232 (2d Cir. 1999) (citing "necessity and trustworthiness" as residual hearsay requirements).

The residual hearsay exception is used to admit necessary, relevant, and reliable evidence in the interests of justice, but it is not the panacea that Kandic makes it out to be. Where, as here, the proffered statements would benefit from adversarial testing, and the information contained in the proffered statements is available in other, more direct, and more probative forms, the residual hearsay exception does not override the court's discretion in determining what evidence is, and is not, acceptable for the jury. Accordingly, Kandic's motion to admit these sworn sibling affidavits under the residual hearsay exception is DENIED.

### C.  Testimony from Armando Cordoba

Kandic also moves to permit Armando Cordoba, an Australian journalist, to testify about information told to him by the Bilardis and others. That motion is DENIED. Cordoba was working a story—a sensational one at that—about the "skinny, baby-faced," "White Jihadi." (*See, e.g.*, Ex. F (Dkt. 278) at ECF p. 66.) The court therefore declines to allow Mr. Cordoba to narrate his view of the story through double- and triple-hearsay.

### III. CONCLUSION

For the reasons stated above, Defendant Mirsad Kandic's (Dkt. 278) motion is DENIED.

SO ORDERED.

Dated:   Brooklyn, New York
         May 13, 2022

 /s/ Nicholas G. Garaufis 
NICHOLAS G. GARAUFIS
United States District Judge
