DMP:SK/JMH
F. #2011R00298

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                        Docket No. <u>17-CR-449 (NGG)</u>

MIRSAD KANDIC,

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - X


<u>THE GOVERNMENT'S SENTENCING MEMORANDUM</u>


BREON PEACE
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Saritha Komatireddy
J. Matthew Haggans
Assistant U.S. Attorneys
    (Of Counsel)

# TABLE OF CONTENTS

BACKGROUND ................................................................................................ 2

I.  THE ISLAMIC STATE OF IRAQ AND AL-SHAM ........................................... 2

II. THE DEFENDANT'S MATERIAL SUPPORT TO ISIS .................................... 4

   A.  Late 2013-Early 2014: The Defendant Travels to Syria and Joins ISIS ...................... 4

   B.  Early 2014-January 2017: The Defendant Establishes a Base of Operations and Safehouses in Istanbul, Turkey ...................................................................... 7

   C.  January 2017-June 2017: The Defendant Relocates to Bosnia and Continues Serving ISIS Objectives .................................................................................. 18

   D.  June 29, 2017: The Defendant Is Captured in Sarajevo, Bosnia ................................ 20

PROCEDURAL HISTORY ............................................................................... 22

I.  PRETRIAL PROCEEDINGS ............................................................................ 22

II. TRIAL AND CONVICTION ............................................................................. 22

LEGAL FRAMEWORK .................................................................................... 25

I.  THE APPLICABLE GUIDELINES CALCULATIONS ................................... 25

II. THE 3553(A) SENTENCING FACTORS ......................................................... 27

ARGUMENT ..................................................................................................... 29

I.  THE DEFENDANT PROVIDED NEARLY EVERY FORM OF MATERIAL SUPPORT DEFINED BY STATUTE ................................................................. 29

II. THE COURT SHOULD IMPOSE THE MAXIMUM SENTENCE POSSIBLE ........... 30

   A.  Comparable Sentences ............................................................................. 30

   B.  The Nature and Seriousness of the Defendant's Egregious Conduct Requires the Maximum Sentence ............................................................................. 31

   C.  The Maximum Sentence Is Appropriate to Deter Others and to Protect the Public from Further Crimes of the Defendant ............................................... 32

   D.  The Defendant's History and Characteristics Also Support the Maximum Possible Sentence ............................................................................... 34

    E.  Supervised Release ................................................................................ 36

    F.  Financial Aspects of Sentencing ........................................................... 37

CONCLUSION ................................................................................................ 38

<u>PRELIMINARY STATEMENT</u>

The government respectfully submits this memorandum in advance of the sentencing of Mirsad Kandic ("Kandic" or "the defendant"), currently scheduled for July 14, 2023, at 11:00 a.m.

The defendant was a dedicated, resourceful, capable, connected asset for the Islamic State of Iraq and al-Sham ("ISIS" or "Dawla") from late 2013 until his capture in June 2017. For years, operating from safehouses in Syria, Turkey, and Bosnia, the defendant poured resources into ISIS's bloody, brutal campaign of global jihad. Money, weapons, equipment, and false identifications were all funneled by the defendant into the hands of *mujahideen* (holy warriors) bound for ISIS battlefields. Many *mujahideen* were recruited or trafficked by the defendant personally, included but not limited to Jake Bilardi ("Bilardi"), an Australian teenager. Bilardi and countless others met violent ends in Syria and Iraq as a consequence of ISIS's bloody campaign, sometimes (as with Bilardi) as suicide bombers. In the case of Bilardi and other ISIS members who died, the defendant celebrated and lionized their service to ISIS on Twitter and other platforms. In the case of those enemies of ISIS killed at ISIS' hands— all *kuffar* (infidels) in his eyes—the defendant celebrated and praised their deaths. The defendant's multifaceted service to ISIS only ended when he was captured in Sarajevo, Bosnia, in June 2017.

The defendant was a global terrorist for a global terrorist organization at the zenith of that murderous organization's power. He was responsible for the deaths of countless men, women, children, and families in Syria and Iraq. The defendant condemned them to that end because he wanted to "build Dawla," to build ISIS, because he wanted ISIS to succeed.

The defendant should spend the rest of his life in federal prison.

1

## I.     THE ISLAMIC STATE OF IRAQ AND AL-SHAM

As proven at trial, ISIS traces its history back to 1999 in Afghanistan, when a predecessor organization was created by Abu Musab al-Zarqawi. See Tr. at 1079.[1] By October 2004—at the time operating under the moniker "al-Qaeda in Iraq"—ISIS was designated by the United States Secretary of State as a foreign terrorist organization ("FTO"). See Tr. at 1080; GX 990A-990E (reflecting periodic updates to the FTO designation to track changes in ISIS's self-nomenclature).

By 2012 and 2013, ISIS established territorial control in large parts of Syria, and began to expand its dominions in northwestern Iraq, ultimately conquering a large portion of that country as well. See Tr. at 1086. ISIS became so entrenched, in fact, that by June 29, 2014, its leader, Abu-Bakr al-Baghdadi, declared ISIS to be the reinstated Caliphate for the entire global Muslim community, from the al-Nuri Mosque in Mosul, Iraq, shortly after ISIS conquered that city. See Tr. at 1086-87, 1091-92; GX 4 (photograph of al-Baghdadi delivering said speech); GX 2200H (video clip containing portions of said speech). At this time, ISIS also deleted the geographic limitations from its name—"Iraq and al-Sham"—manifesting its intention to "create a state for all Muslims worldwide, [] conquering the entire Muslim world, [] from Morocco to Indonesia." See Tr. at 1089. At its apogee, ISIS controlled territory in

---

[1]     Citations to "Tr." are to the trial transcript; citations to "GX" are to government trial exhibits; citations to "PSR" are to the Presentence Investigation Report dated May 5, 2023.

Syria and Iraq roughly equivalent to the size of France, with approximately ten million inhabitants.  See Tr. at 1124-25.[2]

ISIS disseminated propaganda beseeching Muslims to travel to ISIS territory—to make *hijra*—to join the so-called Caliphate.  Over the relevant period, tens of thousands did so.  See Tr. at 1100; GX 2230A (ISIS publication <u>Dabiq</u>, published July 2014, issue titled "The Return of the *Khilafah* [Caliphate]," articles titled "The World is Divided Into Two Camps," "A Call to *Hijra*," and "A Call to All Muslim Doctors, Engineers, Scholars and Specialists").

English-speaking recruits—such as the defendant—were particularly valued by ISIS because they could translate ISIS media into English and then disseminate it to the English-speaking world, and also because such recruits typically had passports that made it easier for them to travel within western countries.  See Tr. at 1135-36.  By September 2014, after other countries made travel to ISIS territory more difficult, ISIS began to exhort potential *muhajireen* (i.e., travelers making *hijra* to ISIS territory) to conduct attacks in their own countries if they were unable to travel.  See Tr. at 1141-42, 1147.  ISIS also developed satellite presences in several other countries, including Afghanistan, Bangladesh, Egypt (Sinai), Libya, the Philippines, Somalia, Yemen, and elsewhere.  See Tr. at 1085, 1177-78.

During the relevant period of 2013 to 2017, ISIS was the deadliest FTO in the world, and responsible for the most terrorist attacks in that same period.  See Tr. at 1172.

---

[2]     By way of comparison, France is slightly larger than four times the size of the U.S. state of Georgia, and slightly smaller than the state of Texas.  See "France," <u>CIA World Factbook</u> (Mar. 30, 2023).

II.     THE DEFENDANT'S MATERIAL SUPPORT TO ISIS

   A.     Late 2013-Early 2014: The Defendant Travels to Syria and Joins ISIS

       At all relevant times, the defendant was a citizen and national of Kosovo, and a legal permanent resident of the United States.  Tr. 109; GX 919A, 920A; PSR ¶ 50.  From approximately May 2003, the defendant resided principally in the Bronx, New York.  Tr. 111.

       Beginning as early as the summer of 2012, the defendant was making efforts to leave the United States.  On July 18, 2012, he was denied boarding on a flight to Frankfurt, Germany, that was scheduled to depart via JFK International Airport located in Queens, New York.  Tr. 123-27; GX 1406.  On January 20, 2013, the defendant again tried to depart the United States bound for Europe, this time via Canada, aboard a flight from Toronto to Istanbul, Turkey, a common transit point into Syria and ISIS territory.  Tr. 750-51; GX 1411.  He was not able to depart aboard that flight and returned to the United States via Buffalo, New York, the following day.  Tr. 127-28; GX 1406.

       The defendant's third effort to depart for ISIS battlefields in late 2013 was successful.  He replaced his valid Kosovo passport issued in April 2012 with a new one in October 2013, but the only substantive change was to swap in a cleanshaven photograph.  Cf. GX 308B, 310B.  By November 2013, the defendant succeeded in departing the United States for Istanbul, via a circuitous route with stops in Houston, Texas; Monterrey, Mexico; Panama City, Panama; Sao Paulo, Brazil; Lisbon, Portugal; Munich, Germany; and Stuttgart, Germany, over several days in mid-November.  See Tr. 135-38, 161-65.  After a further detour to Kosovo, see Tr. 186, GX 404, the defendant flew to Istanbul, Turkey, arriving on December 25, 2013.  GX 310A at 4; Tr. 165-66.  The defendant and co-conspirator Ruslan Asainov had previously coordinated their travel, arriving in Istanbul on the same day.  Tr. 179-80, 190; GX 406.

Shortly thereafter, accompanied by Asainov, the defendant entered Syria and joined ISIS in the area of Haritan, Syria.[3]  Tr. 379, 1427; ██████████████████ ████████████████████████████ encountered the defendant, who was carrying an automatic rifle, at a "villa" in Haritan in January 2014); GX 1532, 2002J; ████████ ████████████████████████████ (witness met "Abdurrahim the Bosnian," i.e., the defendant, "on the outskirts of Aleppo," i.e., Haritan, in early 2014).  The defendant had coordinated his arrival in Haritan ahead of time with other ISIS fighters from among ██

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████

The defendant joined the brigade *Jaysh al Muhajireen wal Ansar* ("JAMWA"), composed principally of foreign fighters and led at the time by Omar al Shishani.  ████████

████████████; GX 9 (photograph of Shishani); Tr. 1129-31.  JAMWA was later subsumed by ISIS, and Shishani later became the effective ISIS minister of defense, reporting directly to

---

[3]      In February 2023, Asainov was convicted of three counts of conspiracy to provide and providing material support to ISIS in violation of 18 U.S.C. § 2339B, one of which resulted in death; one count of receipt of military-type training from ISIS in violation of 18 U.S.C. § 2339D; and one count of obstruction of justice in violation of 18 U.S.C. § 1512(c).  United States v. Asainov, No. 19-CR-402 (NGG) (E.D.N.Y.).  Asainov credited the defendant as "the brother who made a road for me for jihad . . . and with him [I] have entered Sham [i.e., Syria.]"  GX 1532 at 2; Tr. 1527.

Baghdadi, the ISIS caliph. ████████████████████████; Tr. 380. The defendant

met and stayed with Shishani's brother at one point during this period. Tr. 379-80. Later, in

2016, Shishani was killed. Tr. 1131, 1200.

The defendant also fought in at least one battle in which he claimed to have

given tactical suggestions that were ultimately pivotal in winning a successful outcome for

ISIS. Tr. 382-83.

The defendant later acknowledged to others, via electronic messaging platforms,

that he had been an ISIS fighter before taking on other roles: "I used to fight every day before,"

but "now [I']m not allowd [*sic*] to go to front." GX 1102A. The defendant later told Bilardi,

via Twitter direct messages, that he "miss[ed]" amaliyah, i.e., fighting on behalf of ISIS. GX

2015B at 4; <u>see</u> <u>also</u> Tr. 1523-24 (defining "amaliyah" as "military operation").

The defendant also sent a government witness a photograph depicting himself

seated near what appear to be a PK machine gun with multiple visible belts of ammunition and

one or more AK-47 style assault rifles. GX 1013 (reproduced below).



The defendant later described this photograph to a government witness and admitted to her that it could prove he had been inside Syria. Tr. 386.

B. Early 2014-January 2017: The Defendant Establishes a Base of Operations and Safehouses in Istanbul, Turkey

1. The Defendant's Close Relationships With Senior ISIS Personnel

From Istanbul, the defendant maintained a number of close relationships with core ISIS personnel. For example, Bajro Ikanovic, a Bosnian national, was selected by Shishani to run the "largest training camp for recruits" in northern Syria. Tr. 409-10; 1131-

32; GX 21. Ikanovic was "one of [the defendant's] best friends." Tr. 410. Voice messages exchanged between the defendant and Ikanovic made clear the trust they put in one another. For example, in one message in January 2016, the defendant alerted Ikanovic about a "spy who is in Mosul [, Iraq]." GX 1700HT (product 22837794Q). The defendant knew quite well what happened to spies if caught by ISIS: they would be killed. Tr. 1097 (ISIS executed "spies and traitors"); see also, e.g., GX 2054A (photographs tweeted by the defendant of two men about to be executed, with caption "IS[IS] Beheads Two Coalition member Spies in Aleppo[, Syria].").

The defendant relayed battlefield intelligence to Ikanovic, including, for example, reports of successful attacks in and around Ramadi, Iraq, in February 2016. GX 1700HT (product 23195418Q). And Ikanovic, in turn, trusted the defendant with knowledge of his own whereabouts and battle readiness: "I arrived yesterday, you know, from Mosul[, Iraq], brought army with me and came to get some rest . . . I hear that we've moved from all sides . . . I'm waiting for more information[,] or for the brother to get here so that I can go down to the front right away." GX 1700HT (products 23195425Q, 23195462Q). Ikanovic also acknowledged that the defendant's "information is the best[.]" GX 1700HT (product 23195426Q).

Ikanovic was later killed. Tr. 410, 1200; ███████████ .

The defendant maintained relationships with other significant ISIS personnel, including but not limited to Abu Luqman and a man named Abdullah. By 2013, Abu Luqman was the governor of Raqqa province for ISIS. Tr. 465, 1125 ("[Abu Luqman] was a very prominent ISIS leader and controlled pretty much various aspects of ISIS activities in the Raqqa area from oil to hostages[.]"). Abdullah was ISIS's emir for all safehouses in the

Istanbul area.  Tr. 417.  The defendant also continued to travel back and forth to ISIS territory on occasion, including to Raqqa, the de-facto ISIS capital.  GX 2015B at 4-5; GX 1003A at 2 ("I'm a *Mujahid* of IS [i.e., ISIS,] I travel in and out of *Dawlah* (D)").

The defendant also claimed, in Twitter messages, to be closely associated with Raphael Hostey (a/k/a Abu Qaqa al Britani) and Neil Prakash (a/k/a Abu Khalid Kambodi).  GX 2056B (Oct. 2015 Tweet from "JoinISNation82").  Hostey was a "fairly prominent media propaganda operative" for ISIS, Tr. 1134; similarly, Prakash engaged in online recruitment and radicalization on behalf of ISIS.  Tr. 1134-35.  The defendant challenged those who questioned his ISIS bona fides to go to Raqqa, the ISIS headquarters, where the defendant indicated either or both of Prakash and Hostey would vouch for him.  GX 2056B.

2.    The Defendant Disseminated ISIS Propaganda and Executed ISIS's Media Objectives

The defendant operated dozens of Twitter accounts for the purpose of disseminating ISIS propaganda and recruitment, under evocative names like "Dawla News Media," "Great IS Nation," "Greatest Nation," "JoinISNation," and the like.  See generally GX 2000, 2000S; see also GX 2001-2123 series.  For broad-based recruitment, the defendant sent direct calls for Muslims to answer the ISIS call to jihad: "Jihad is the only way forward for Muslims to free themselves from tyrant rulers and US Hegemony.  #Islamic State[.]"  GX 2002BN (Aug. 24, 2014 tweet from Dawla New Media account); "If Shaam [i.e., Syria] is closed[,] than [*sic*] join the Army of Khalifah Ibrahim HA [i.e., Baghdadi] in Libya, Yemen, Sinai, Khurasan [i.e., Afghanistan], & Libya you can join with your family[.]"  GX 2050D (Sep. 2, 2015 tweet from GreatISNation75 account).

As for propaganda: the defendant distributed all manner of propaganda for ISIS. One government witness testified that the defendant was an "emir," or leader, for media, and that he was in direct contact with other ISIS media personnel, including but not limited to a Bosnian man named "Salahuddin" who was living in Raqqa, Syria, the de facto ISIS capital. Tr. 384; ███████████. The defendant also told others via Twitter or other platforms that he "work[ed] for dawla [i.e., Islamic State] media." GX 2002D. As one government witness later noted concerning the defendant's Twitter presence: "[H]e was kind of at the middle of everything . . . [W]henever Twitter would do their suspensions, for example, after particularly violent videos were posted . . . when the users reconstituted, they all reconstituted around [him. H]e was right in the middle of all of it." Tr. 564. In fact, among the defendant's earliest online monikers in support of ISIS was the plainly-named "ISIS News Media." <u>See</u>, <u>e.g.</u>, GX 451 (subscriber information for defendant's Gmail account created on April 10, 2014, with address <u>isisnewsmedia@gmail.com</u> under subscriber name "Dawla Media").

One of the propaganda items the defendant distributed, the ISIS video "Flames of War," was a "very well-known ISIS video that was produced in late 2014; arguably, ISIS's most famous video[.]" Tr. 1158; <u>see also</u> GX 2200A-K (clips of the full Flames of War video admitted into evidence). The complete video—largely in English—depicted numerous executions of ISIS enemies. <u>See</u> GX 2200I, 2200J; Tr. 1169-70.

The defendant distributed "Flames of War" via Twitter, calling it the "BEST thing ever seen on screen[.]" GX 2035E (June 20, 2015 Tweet from JoinISNation62).

The defendant also enforced ISIS messaging discipline—to protect jihadists in the field. For example, he told another Twitter user, "[N]ever post the numbers of how many people migrated to IS[IS], it's forbidden to post this information Akhy [i.e., brother]." GX

2013B (Feb. 2015 direct message from "GreatIS_Nation"); <u>see also</u> GX 2007K (similar Dec. 2014 message from another account); GX 2038D (June 2015 Tweet from "GreatISNation65" publicizing the ISIS "Rules of Media Concealment.").

3.      <u>The Defendant Recruited *Mujahideen* to ISIS's Cause</u>

a.      <u>The Defendant Was a Prolific Recruiter</u>

The defendant used numerous social media application and messaging platforms to seek out ISIS recruits ("students") and then advise them on how best to make their *hijra* to the various ISIS territories ("schools") to which he trafficked aspiring members. Tr. 390. The defendant sent recruits to Syria, Afghanistan, Libya, Sudan, Somalia, and Sinai (Egypt). Tr. 391. To his traveling recruits, he gave advice such as "You should not have a beard at all . . . So [you] don't look religious," advice he himself had used successfully in his *hijra* as noted above. <u>See</u> GX 2069D (Jan. 2016 direct messages from "JoinISNation94"). The defendant also advised recruits when it was not safe to travel to Syria: "URGENT[:] Please refrain from making any Hijrah plans for Shaam [i.e., Syria], As the borders are closed.!! However other Wilayat [i.e., ISIS-controlled territories] are still open." GX 2055E (Sept. 2015 Tweets from "JoinISNation81").

The defendant was proud of his work as an ISIS recruiter, so much so that he was comfortable castigating those who, in his view, failed to measure up to his high standard. He criticized another ISIS recruiter and *hijra* planner via a series of voice messages transmitted via Telegram: "Who do you think you are? Sit down and shut up and listen . . . You have to follow the advice of your brothers who have experience this work. Who know what they're doing. You see, we build *dawla* [i.e., the Islamic State], *akhy* [brother]." GC 1333E; <u>see also</u>

GX 1333TR (transcript). The defendant bragged that he had trafficked in "20,000" brothers for Syria, and made clear what he hoped they would do: "Let them fight." GX 1333E.

The defendant sent some recruits to his friend Asainov, so they could train with Asainov as a sniper. The two were "very close friend[s]" and the defendant "was proud of [Asainov]" and his achievements for ISIS. Tr. 406. The defendant later described Asainov to an aspiring ISIS sniper: "[H]e [i.e., Asainov] is one of the best. He is emir of *muascar* [i.e., training camp] for a long time, of snipers, for a few years now. He is a good brother." GX 1338BD.

### b. The Defendant Ran Safehouses in Istanbul for ISIS Recruits

The defendant operated one or more safehouses in Istanbul for the purpose of temporarily housing ISIS recruits pending clearance to proceed to Syria to ISIS territory. See, e.g., Tr. 319, 323. Several ISIS recruits stayed at safe houses operated by the defendant, including but not limited to a man named Abu Imran (Tr. 396) and a family from Trinidad & Tobago (Tr. 402). The latter family was a "priority" to the defendant and to ISIS because the patriarch of the family had experience as a military aircraft pilot. Tr. 402-03.

### c. The Defendant Provided ISIS Members with False Documents

Once in Turkey, aspiring ISIS fighters needed documentation in the event they encountered Turkish law enforcement on their way to Syria. The defendant manufactured hundreds of false Turkish identity cards—*kimliks*—with the assistance of a cooperating witness. Tr. 413-14. The defendant was paid for the service, and delivered the false kimliks to Abdullah, who was then responsible for routing them to the users—men, women, and children. Tr. 416-22; see also GX 2305-06. Among other individuals for whom the defendant and Delija forged a kimlik was an ISIS fighter from Bangladesh who appeared to be fleeing a

July 2016 attack committed in its capital, Dhaka. The defendant helped this "Bengali brother" make the journey into ISIS controlled territory, specifically Idlib, Syria. Tr. 422-24. ISIS later praised the Dhaka attack and eulogized other ISIS attackers killed in its execution in its online magazine, Rumiyah. GX 2258A; Tr. 1155 (testimony that the article "give[s] a profile of the five individuals that carried out the attacks. It glorifies them. Talks about how brave they were."); Tr. 1137 (testimony about the Dhaka attack, in which 27 people including an American citizen were killed).

The defendant also had access to numerous false Syrian national identity cards. See Tr. 456-57 (testimony describing a false Syrian identity card obtained from the defendant; GX 1700BT, 1700CTT (images of false Syrian identity cards). The defendant also made use of at least two false Ukrainian passports (GX 312, 313), and obtained two other false Ukrainian passports. See Tr. 449; GX 315, 316. The defendant also acquired passports for others and resold them at a profit. Tr. 449-50. For example, in one voice recording later recovered from the defendant's cellular telephone, the defendant explained to another apparent ISIS member that the defendant knew a passport forger in Europe, who had previously been known to Abdullah (the ISIS emir for safehouses in Istanbul). Of this passport forger, the defendant vouched for his skill set: "I know about this . . . they did a bang-up job with this[.]" See GX 1354TR (principally Russian-language Telegram voice memo exchange with unidentified individual); see also 1351TR (similar exchange of voice memos in which the defendant refers to false Ukrainian, Romanian, American, Canadian, British, Latvian, and Slovenian passports). The defendant also appeared to have access to false visas for use by ISIS members. See GX 484-85 (images of "entry permits" for the Republic of the Sudan for various individuals), Tr. 1669-1671.

<u>The Defendant Recruited Jake Bilardi, a/k/a Abu Abdullah al Australi</u>

On June 1, 2014, via his computer in the outskirts of Melbourne, Australia, Jake Bilardi conducted a Google search for the phrase "turkey-syria border smugglers." GX 1238. At the time, Bilardi was about two weeks away from turning 18 years old. GX 1202. By June 3—barely 48 hours later—Bilardi was in contact via Twitter with the defendant, who—as set forth above—was a prolific border smuggler for ISIS. GX 1222S.[4] Over the course of the next several weeks, the defendant guided Bilardi on his path to ISIS territory, giving him instructions on what to do, what not to do, what to bring, and what not to bring. GX 1222S. The defendant also gave Bilardi specific instructions on what to do when he arrived in Istanbul—where to go upon deplaning and what to do. GX 2002B at 11-12.

Bilardi did as the defendant instructed and succeeded in joining ISIS in Syria, by late August or early September 2014. In a later online posting, Bilardi credited the defendant with his success in making *hijra*. GX 1235A at 4 (noting Bilardi's "confiden[ce] that the brother [i.e., Kandic] was genuine").

Over the next several months, the defendant and Bilardi remained in contact, as Bilardi fought in several ISIS battles and prepared to carry out a suicide bombing mission. GX 1235A at 4 (Bilardi blog post dated Jan. 13, 2015) ("I turned to fighting in the city before once again registering for a martyrdom operation[.]"). By early March, with Bilardi's suicide attack only a week away, the defendant expressed surprise that Bilardi was still alive, but

---

[4]    At or around the time that Bilardi was in contact with the defendant via Twitter, the defendant's Twitter account had approximately 14,000 "followers," i.e., accounts subscribing to the defendant's Twitter feed. Tr. 805.

Bilardi assured him that "it" (his suicide bombing) "should be relatively soon" in Ramadi. GX 2015B at 1. The defendant prayed for Allah to "reward [Bilardi] immensely" for his and ISIS's attack upon Ramadi, asking Allah to "level them with the ground" and to "make the[ir] inner organs implode[.]" GX 2015B at 3, 6.

Bilardi's suicide attack on March 11, 2015, was one of "between eight and ten major attacks" that day in al-Anbar province, of which Ramadi is the capital. Tr. 1050. The "highly coordinated" attacks involved at least eleven suicide bombers, including Bilardi, and the March 11 attacks "paved the road to the fall of al-Anbar province" by May 2015 to ISIS. Tr. 1050-51. As to Bilardi specifically, communications intercepted by the Iraqi military reflected that Bilardi was "congratulated" by other ISIS fighters for the "success" of his attack, after which ISIS began issuing "condolences" for Bilardi's death, using his *kunya*, Abu Abdullah al-Australi. Tr. 1051, 1060, 1062-63.

The defendant later praised Bilardi's suicide attack to a government witness:

> I remember [the defendant] mentioning it, a name of a person and it was Jake, and either [the defendant] met [Jake] there or [the defendant] communicated with him. I know [the defendant] communicated with [Jake] while [Jake] was – [Jake] went into Syria, he joined ISIS, but [the defendant] helped [Jake] somehow…when [Jake] came to Istanbul[,] did [the defendant] meet [Jake] there, or did [the defendant] just helped [Jake] go towards down to Syria, and that [the defendant has] spoken with [Jake] and that [Jake] was a good brother, you know, righteous, good brother. And Jake died, I learned how and all that, how it happened . . . He committed, like, a suicide bomb attack, Jake did.

Tr. 431. More than thirty people were killed in the coordinated attacks of March 11, 2015, in which Bilardi played a key, deadly role. Twenty-five people were missing, "whose bodies were never found"; and 61 people were injured, some of whom later passed away. Tr. 1053. Of this attack, the defendant tweeted that Bilardi's "martyrdom operation" as a "Lion

*Istish'hadi* [i.e., suicide bomber]" had "killed 57 Shia *kufar* [i.e., infidels] and wounded many more in Ramadi."  GX 2016G, 2067B, 2095A (Mar. 11, 2015 Tweet from GreatISNation45; Dec. 1, 2015 Tweets from JoinISNation and GreatISNation96).  Of other suicide bombing attacks committed by ISIS members, the defendant later said: "*Alhamdulillah* [i.e., "thank God"] today seventy-something got killed with two *istishadis* [i.e., suicide bombers], *Alhamdulilllah* and yesterday also twenty something, twenty-three I think.  *Alhamdulillah* it is good."  GX 1346H.

          4.     <u>The Defendant Procured Warfighting Equipment for ISIS</u>

While working for ISIS from Istanbul, the defendant formed a relationship with a South African-based individual ("the South African").  They communicated principally via WhatsApp, exchanging voice notes and images of thermal, magnification, and night-vision optics, items about which the defendant sought input from the South African on pricing and availability in South Africa.  <u>See</u> <u>generally</u> GX 1700BT, GX 1700CTT.  On at least one occasion, the South African successfully routed night vision equipment into ISIS territory, for use by Asainov, via the defendant in Istanbul.  Tr. 343-49, 412.

The defendant also operated an online ISIS-focused chat group for weapons and other warmaking equipment under the name "Khilafah Market."  <u>See</u> <u>generally</u> GX 1380A-1380J (chat group extracts recovered from the defendant's cellular telephone); GX 1381A-1381O (listing of members).  Members could purchase or sell what appeared to be suicide vests (GX 1380I, 1390), mortars (GX 1380D-1380G), and rifles such as M16s (GX 1380H). The defendant was the administrator of the Khilafah Market, controlled access to the group and enforced group rules.  <u>See</u> GX 1340TR (transcript of voice notes in which defendant criticizes another member of the Khilafah Market for not following his rules: "[Y]ou know

you cannot say I have Kalashnikov how much money do you give me? . . . [Y]ou have to give the price . . . [I]n Dawla [i.e., the Islamic State] you have to have the price on everything that you sell.").  The defendant enforced those rules because he understood the value of his market to ISIS: "Every person has to be in Dawla.  I cannot add anyone outside of Dawla," i.e., outside ISIS territory, "[b]ecause if the police take their phone or anything, then they will check the Khilafah Market.  You know?  We don't, we cannot compromise that, *akhy* [i.e., brother]."  GX 1337TR; <u>see also</u> Tr. 464-65.  Among more than 100 other members, the Khilafah Market counted in its ranks Abu Luqman (Tr. 465; GX 1381A) and a man who went by the pseudonym Abu Muhammad al-Almani (GX 1381E).

The defendant also tried to facilitate a transfer of funds for the benefit of Asainov via a government witness ("the CI").  In March 2015, Asainov contacted the CI via Surespot seeking a "good scope for [his] rifle."  GX 1528.  Asainov ultimately referred the CI to the defendant, via his Surespot handle at the time: "DontAsk," and the defendant reached out to the CI via that account.  GX 1533, GX 1535.  In the same period, the defendant and Asainov were in frequent contact via Surespot.  <u>See</u> <u>generally</u> GX 1508 (Surespot message logs); GX 1505 (Asainov's identification of his Surespot handle, sabrforever); Tr. 329 (testimony that defendant has a Telegram account with name "Don't Ask Stuff").

     5.    <u>The Defendant Refused to Aid</u> ██████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████



███████████████████████████████████████ .[5]

C.     January 2017-June 2017: The Defendant Relocates to Bosnia and Continues Serving ISIS Objectives

On January 18, 2017, shortly after the New Year's Eve ISIS attack upon an Istanbul nightclub, the defendant flew to Sarajevo using a false Ukrainian passport in the false name of "Ivan Popovich."  Tr. 447-48, 454, 457-58, 728-30, 752-53; GX 312, 1412.  From Sarajevo, the defendant continued his support for ISIS.

-------------------

[5] ████████████████████████████████████████████████████████████████████████████████████████████████████████████████

1. The Defendant Continued to Transfer Money to ISIS Members

As he had been doing in Turkey, the defendant continued to access funds belonging to ISIS fighters in Syria or elsewhere so that he could transfer those funds to them via the *hawala* (i.e., unregulated money transfer) system.  Tr. 398-99 (testimony describing defendant's use of hawalas); Tr. 1129 (Dr. Vidino's testimony describing *hawala* system). Based on account records obtained from Finland, Germany and South Africa, over the course of several years, the defendant withdrew or otherwise spent more than 40,000 Euros he drew from accounts belonging to other individuals using cards provided to him by ISIS fighters or by the South African.  See generally GX 510-18.  The defendant maintained a ledger of funds and payments for ISIS fighters on his cellular telephone.  See GX 1370-71.  ISIS fighters, including but not limited to Asainov, maintained contact with the defendant so they could access their funds inside ISIS territory.  See, e.g., GX 1344TR (Asainov asking the defendant in late June 2017 to send the money to Raqqa via another man, Abu Muhammad al-Almani, and directing al-Almani to give the money "to the brothers from my *katiba* [i.e., fighting unit]"); GX 1338TR (a late January 2017 voice memo exchange between the defendant and another man about what funds to withdraw from one bank account and how to distribute them between the other man, the other man's wife, and the defendant, among other topics).

2. The Defendant Maintained His Communications With Numerous ISIS Members, Offering Advice and Support to the ISIS Cause

As the evidence later recovered from the defendant's cellular telephone made clear—and in addition to the dialogues the defendant maintained with Asainov summarized above—the defendant was still actively engaged in numerous other forms of support to ISIS after fleeing Istanbul.  See, e.g., GX 1360TR (Kandic's March 2017 voice messages warning

"brothers" in Istanbul "not to leave the city" because "these cops . . . blocked everything" and were "searching for people"); GX 1337TR, 1340TR (Kandic's April 2017 voice messages assisting another Khilafah Market member in regaining access to the Telegram group, and then criticizing another Khilafah Market member for breaking the market's rules); GX 1350TR (Kandic's April 2017 voice messages seeking assistance for routing "brothers in Africa" via Sinai, Egypt, with the assistance of "the Immigration Office in Raqqa"); GX 1351TR (Kandic's May 2017 voice messages in which, among other topics, he seeks assistance to transfer more than $8,000 from Istanbul to Mosul, Iraq (at the time still partially under ISIS control)); GX 1333TR (Kandic's June 2017 voice messages criticizing another "*hijra* department" and claiming "I have the safest way to send the *muhajireen*, the single brothers," via Sinai, Egypt).

On June 14, 2017—approximately two weeks before his capture—the defendant had a back-and-forth exchange of voice messages with Asainov. GX 1343A-L. Asainov indicated that he was contacting Kandic from Raqqa, to where he needed Kandic to send money. In two of the recordings, large explosions are plainly audible in the background, explosions that Asainov describes as "they bombing, boom . . . Heard that? That's *kuffar*, *akhy*." GX 1343F-G. Kandic's response, from the comparative safety of Sarajevo, was to laugh. GX 1343H.

D.     June 29, 2017: The Defendant Is Captured in Sarajevo, Bosnia

On the evening of June 29, 2017, the defendant was apprehended by Bosnian immigration authorities near his apartment building in Sarajevo. Tr. 634-35. Asked for identification, he presented a false Montenegrin identity card and a false Montenegrin driver's license, both bearing the name "Edin Radoncic." Tr. 635, 643-45; GX 303A-303C. The

defendant maintained that false identity with Bosnian authorities for several days before ultimately admitting that his true name was Mirsad Kandic. Tr. 639. The defendant was carrying more than 1,000 units of Bosnian currency, and 300 Euros. Tr. 650; GX 2308, 2308A. The defendant was also carrying the three bank cards issued to other people by financial institutions in Finland, Germany and South Africa. Tr. 652-53; GX 511, 514, 517. Authorities also seized his cellular telephone. GX 1300, 1300S.

Following extradition proceedings, the defendant was transferred from Bosnian custody in Sarajevo to FBI personnel, and thereafter transported by plane to JFK International Airport in Queens, New York, within the Eastern District of New York. Tr. 1698-99.

## PROCEDURAL HISTORY

### I.     PRETRIAL PROCEEDINGS

On April 22, 2016, the defendant was charged by complaint with conspiracy to provide material support to ISIS in violation of 18 U.S.C. § 2339B.  See Complaint, ECF No. 1.  On August 17, 2017, a grand jury sitting in the Eastern District of New York returned an indictment ("the Indictment") charging the defendant with conspiracy to provide material support to ISIS in the form of property, services and personnel, including himself, Jake Bilardi, and others, in violation of 18 U.S.C. § 2339B (Count One).  See Indictment, ECF No. 4.  The Indictment also charged five substantive violations of 18 U.S.C. § 2339B, in the forms of: personnel, including the defendant and others (but not Bilardi) (Count Two); services (Count Three); property and equipment (Count Four); personnel (specifically, Bilardi) (Count Five); and false documentation and identification (Count Six).  Count One charged that the offense resulted in the deaths of one or more persons, including Bilardi; and Count Five charged that the offense resulted in the death of Bilardi.  See id.

The defendant arrived in the United States in FBI custody on October 31, 2017, and was arraigned the following day before the Honorable Ramon E. Reyes, Jr., and ordered detained.  He has remained in custody since that date.  See PSR at 1.

### II.    TRIAL AND CONVICTION

Following jury selection proceedings conducted in March and April 2022, trial began on May 3, 2022.  Over approximately ten trial days, the government presented testimony from 36 witnesses.  Two witnesses testified via pretrial depositions pursuant to Federal Rule of Criminal Procedure 15—███████████████████████████. Multiple Bosnian law enforcement witnesses traveled to Brooklyn to testify concerning the circumstances of the

defendant's arrest in Sarajevo as well as to provide contextual testimony concerning Ikanovic. Several Australian law enforcement witnesses traveled to Brooklyn to testify concerning their investigation concerning Bilardi. A four-decade veteran of the Iraqi military, General Rasheed al-Holfi, testified via interpreter concerning the assault upon Ramadi, Iraq, of which Bilardi's suicide bombing played a part. Multiple American law enforcement personnel testified concerning various records, documents, and recordings establishing the defendant's conduct as described above.

After approximately two hours of deliberation, the jury returned a verdict of guilty on each of the six counts charged. As to Count One, the jury found that Bilardi's death, as well one or more deaths of other persons, resulted from the offense.[6] As to Count Five, the

---

[6] On the eve of trial, the defense moved to dismiss Count One on the grounds of duplicity. See ECF No. 272 (May 1, 2022). The Court denied that motion in a written opinion on May 4, 2022. See Op. and Order, ECF No. 280. The Court concluded that Count One was duplicitous because it charged multiple deaths resulting from a single offense, but not impermissibly duplicitous because there was no prejudice to the defendant. See id. at 5 (citing United States v. Sturdivant, 244 F.3d 71, 75 (2d Cir. 2001). The Court correctly held that any concern that the jury's verdict would be non-unanimous as to which death was proven could be cured by a proper jury instruction; that Count One was sufficiently broad to avoid any potential double jeopardy problem; and that the defendant could not have been prejudiced by any late notice given the nearly five years the indictment had been pending and the government's voluminous discovery productions, among other reasons. See Op. and Order, ECF No. 280 at 5-9.

Consistent with the Court's ruling as to unanimity, the Court later directed the government to specify prior to closing arguments which deaths the government would argue to the jury had been proven resulted from the offense charged in Count One. See generally Tr. of Charge Conf. (May 19, 2022); ECF No. 302 (May 19, 2022) (government's letter specifying deaths that resulted from the conspiracy charged in Count One); Def. Ltr., ECF No. 302 (May 20, 2022) (renewing objection to verdict sheet); ECF No. 305 (May 20, 2022) (Court's verdict sheet, as to this issue on Count one: "Do you unanimously find that the offense resulted in the death of any other person or persons?" (emphasis added)); Tr. 1867-69 (Court's overruling defendant's renewed objection to the verdict sheet).

jury found that Bilardi's death resulted from the offense.  See generally Tr. (May 24, 2022);

Verdict Sheet, ECF No. 321 (May 24, 2022).

---

As the Court's final charge to the jury properly reflected, the jury was instructed more than once that they had to be unanimous on this point:

> [I]n order to find the government has proven that the commission of the offense resulted in a death, you must be unanimous[.] [Y]ou must be unanimous as to the person's death that you are considering.  It is not enough for some of you to find that the government has proven one person's death and another of you to find that the government has proven a different person's death. In other words, if you find that a death resulted, you must all agree as to that specific death.

Tr. 1969 (emphases added).  Accordingly, the government respectfully submits that any theoretical duplicity prejudice to the defendant as to Count One has been cured.  See also United States v. Helmsley, 941 F.2d 71, 91 (2d Cir. 1991) ("any possibility of a duplicitous verdict was removed by [the trial judge's] careful charge regarding unanimity").

<u>LEGAL FRAMEWORK</u>

I.  <u>THE APPLICABLE GUIDELINES CALCULATIONS</u>

The United States Sentencing Guidelines ("U.S.S.G." or "the Guidelines"), while advisory, are still a strong source of guidance for sentencing courts following <u>Booker</u> and its progeny.  <u>See</u> <u>United States v. Booker</u>, 543 U.S. 220, 264 (2005) (holding that while the Guidelines are not mandatory, they remain in effect and must be "consult[ed]" and "take[n] into account" at sentencing).  "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" as the "starting point and the initial benchmark." <u>Gall v. United States</u>, 552 U.S. 38, 49 (2007).

The Guidelines are accurately set out in the PSR.  <u>See</u> PSR ¶¶ 32-45.  Each of the counts of conviction is grouped together.  U.S.S.G. §§ 3D1.2-1.3.  Because two of the counts resulted in death, the applicable guideline is U.S.S.G. § 2A1.1 (First Degree Murder):

| | | |
|---|---|---|
| Base Offense Level / Offense Resulted in an Intentional Death (U.S.S.G. §§ 2M5.3(c)(1), 2A1.1)): | | 43 |
| Plus: | Offense Was A Felony Involving A Federal Crime of Terrorism (U.S.S.G. § 3A1.4(a)) | +12 |
| Plus: | Defendant Was Organizer/Leader of Extensive Criminal Activity Involving Five or More Participants (U.S.S.G. § 3B1.1(a)) | <u>+4</u> |
| **Total:** | | **59** |

The defendant has not demonstrated any acceptance of responsibility for his conduct, so no adjustment under U.S.S.G. § 3E1.1 is warranted.  <u>See</u> PSR ¶ 41.[7]  The adjusted

_____

[7] The government notes that, at trial, counsel's opening and closing arguments to the jury conceded that the evidence would prove the defendant "guilty of some of the crimes

offense level of 59 is treated as offense level 43.  <u>See</u> Sentencing Table, Application Note 2; PSR ¶ 42.  Pursuant to U.S.S.G. § 3A1.4(a), the defendant's criminal history category is VI. PSR ¶ 45.

The corresponding Guidelines range is life imprisonment.  PSR ¶ 71.[8]

_____

he's charged with."  Tr. 94 (defense opening); <u>see</u> <u>also</u> Tr. 1870 (defense closing) ("[F]rom the very first we told you that he was guilty of providing materials for [ISIS].").

These strategic acknowledgements of the strength of the government's case do not make this case one of the "rare situations" in which the acceptance reduction applies "even though [the defendant] exercise[d] his constitutional right to a trial."  U.S.S.G. § 3E1.1, Application Note 2; <u>see also</u> <u>United States v. Helmstetter</u>, 56 F.3d 21, 23 (5th Cir. 1995) (affirming sentencing court's denial of a § 3E1.1 adjustment where defense counsel gave "admission of guilt during closing arguments"); <u>United States v. Tabares</u>, 951 F.2d 405, 410-11 (1st Cir. 1991) (affirming sentencing court's denial of a § 3E1.1 adjustment where defense counsel conceded guilt as to some offenses but not others).

[8] On May 23, 2023, the government submitted a letter to the assigned U.S. Probation Officer proposing minor corrections to the PSR, none of which impact the Guidelines calculation or affect the government's position as to the appropriate sentence.  A copy of the government's May 23 Letter will be filed contemporaneously with this memorandum.  The defendant has not responded to the government's May 23 Letter.

## II. THE 3553(A) SENTENCING FACTORS

After calculating the Guidelines as the initial benchmark, the Court must consider the familiar sentencing factors of 18 U.S.C. § 3553(a) ("Section 3553(a) Factors" or "the Sentencing Factors"). "[T]he nature and circumstances of the offense and the history and characteristics of the defendant," Section 3553(a)(1); "the kinds of sentences available," Section 3553(a)(3); the Guidelines range itself, Section 3553(a)(4); any relevant policy statement by the Sentencing Commission, Section 3553(a)(5); "the need to avoid unwarranted sentenced disparities among defendants," Section 3553(a)(6); "the need to provide restitution to any victims," Section 3553(a)(7); and the need to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which include the following four objectives:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense[s];
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Section 3553(a)(2).

Courts may not presume that the appropriate sentence necessarily lies within the applicable Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." Gall,

552 U.S. at 50 n.6. Their relevance throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the Sentencing judge and the [Sentencing] Commission as carrying out the same basic § 3553(a) objectives," Rita v. United States, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions[.]" Gall, 552 U.S. at 46; see also Rita, 551 U.S. at 349. Should a court choose to vary from a Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." Gall, 552 U.S. at 50.

<u>ARGUMENT</u>

I.     <u>THE DEFENDANT PROVIDED NEARLY EVERY FORM OF MATERIAL SUPPORT DEFINED BY STATUTE</u>

The term "material support or resources" is defined by statute to include:

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials[.]

18 U.S.C. § 2339A(b)(1).

Over his several years of work for ISIS, the defendant provided nearly every form of material support Congress imagined when it defined the term. Currency, monetary instruments, and financial services: in the form of the money transfer services the defendant offered to numerous ISIS fighters. Lodging and safehouses: in several locations in Istanbul. Training: by connecting one or more individuals to his comrade Ruslan Asainov for sniper training. False documentation and identification: by the hundreds of *kimliks*, passports, visas, and other identity cards. Communications equipment: in the form of radios. Weapons and explosives: via the Khalifah Market, WhatsApp, and via his personal connections. Transportation: by advising numerous recruits on travel and assisting numerous aspiring fighters with completing their journeys to ISIS territory. Finally, personnel: in the hundreds, thousands, tens of thousands, in addition to the defendant's own service in combat for ISIS in Syria, months before the declaration of the ISIS caliphate.

ISIS required an army to wage its violent campaign. The defendant provided one. That ISIS army needed warriors. The defendant provided them. Those warriors needed

weapons.  The defendant provided them.  Those warriors needed false documentation and travel assistance.  The defendant provided it.  Anything the violent cause needed, the defendant provided it, without hesitation.

The evidence and testimony presented at trial touched on more than 20 countries on six continents.  The defendant was a global terrorist for a global terrorist organization during the crescendo of its barbarous and bloody assault on the world.  The scale of the Court's sentence should reflect the global scale of the defendant's conduct and ambition.

II.    THE COURT SHOULD IMPOSE THE MAXIMUM SENTENCE POSSIBLE

Each of the applicable sentencing factors counsels in favor of the maximum possible sentence.  The record is replete with aggravating factors.  There appear to be no meaningful mitigating circumstances in the trial record or the PSR, and the defense has, to date, not cited any.  See Def. Sentencing Ltr., ECF No. 353 (June 14, 2023).  Accordingly, the Court should impose the maximum possible sentence of life imprisonment plus eighty years.

A.    Comparable Sentences

A comparison to other similarly situated ISIS offenders and FTO offenders more generally reveals that a life sentence for the defendant's offense conduct is well within the norm for offenders with similarly egregious offense conduct.

- United States v. El Sheikh, No. 20-CR-239 (TSE), ECF No. 322 (E.D.Va. Aug. 19, 2022) (eight concurrent life sentences for ISIS member of the "Beatles" cell responsible for murders of multiple ISIS hostages, including American citizens);

- United States v. Khalifa, No. 21-CR-271 (TSE), ECF No. (E.D.Va. July 29, 2022) (life sentence for ISIS propagandist featured in the "Flames of War" video who executed prisoners of war in the making of that video);

- <u>United States v. Kotey</u>, No. 20-CR-239 (TSE), ECF No. 307 (E.D.Va. Apr. 29, 2022) (eight concurrent life sentences for ISIS member convicted of same offenses as in <u>El Sheikh</u>);

- <u>United States v. Ullah</u>, No. 18-CR-16 (RJS), ECF No. 114 (S.D.N.Y. Apr. 23, 2021) (three concurrent life sentences plus 30 years for bomber of New York City subway, who committed non-fatal attack in support of ISIS, in which multiple commuters were injured);

- <u>United States v. Medunjanin</u>, No. 10-CR-19 (BMC), ECF Nos. 515, 519 2020 WL 5912323, *9 (E.D.N.Y. Oct. 6, 2020) (imposing effective sentence of life—95 years—for various offenses committed in support of ISIS after life sentence for conviction under 18 U.S.C. § 924(c) was required to be vacated following <u>United States v. Davis</u>, 139 S. Ct. 2319 (2019), and noting: "In practice, there is no difference between 95 years' custody and life plus 95 years' custody. Defendant will not be released from prison during his lifetime under either sentence.");

- <u>United States v. Hausa</u> ("Spin Ghul"), No. 12-CR-134 (BMC), ECF No. 306 (E.D.N.Y. Feb. 26, 2018) (imposing multiple life sentences for conspiracies to murder U.S. nationals, bomb a government facility, provide material support to al-Qaeda, and other offenses);

- <u>United States v. Mustafa</u>, No. 04-CR-356 (AT) (S.D.N.Y. Dec. 10, 2015) (imposing multiple life sentences for hostage taking in which four hostages later died, and material support counts in connection with al-Qaeda and the Taliban); <u>see</u> <u>also</u> 753 Fed. Appx. 22 (2d Cir. Oct. 23, 2018) (reversing two convictions under 18 U.S.C. § 2339A on <u>ex</u> <u>post</u> <u>facto</u> grounds but leaving life sentences intact).

B.  <u>The Nature and Seriousness of the Defendant's Egregious Conduct Requires the Maximum Sentence</u>

The defendant devoted years of his life to a global terrorist organization bent on world domination, one that proudly claimed responsibility for innumerable acts of violence and savagery in Syria, Iraq, Bangladesh, Libya, Afghanistan, Egypt, and elsewhere. The "nature and circumstances of the offense," Section 3553(a)(1), are therefore among the most egregious that could be conceived. The defendant's service as an ISIS fighter did not end because he tired of combat. His skill set made him too valuable to risk in combat, so he was

promoted to a more important role. He got promoted because he had earned ISIS's trust: the trust of key leaders like Ikanovic. And the defendant flourished in that role. The defendant was adept and resourceful. ISIS invested in him. ISIS leadership put their trust in him. And the defendant delivered. Money, weapons, and legions of fighters, all poured into a hot, brutal, savage war, by the defendant. The "seriousness of the offense," Section 3553(a)(2)(A), cannot be overstated. The defendant reveled in the violence of ISIS's campaign. He broadcast that violence to the world. And he fueled that violence in any way that he could.

The defendant gave ISIS everything that he had to give short of his life. The defendant has not expressed any remorse, doubt, or even a fleeting moment of self-reflection about his conduct. The Court's sentence should therefore take from the defendant everything that the statutes of conviction authorize the Court to take.

C.    The Maximum Sentence Is Appropriate to Deter Others and to Protect the Public from Further Crimes of the Defendant

The maximum sentence is also necessary and appropriate "to afford adequate deterrence to criminal conduct." Section 3553(a)(2)(B). This is especially so in the context of terrorism offenses. See, e.g., United States v. Stewart, 590 F.3d 93, 181 (2d Cir. 2009) (Walker, J., concurring) ("In no area can the need for adequate deterrence be greater than in terrorism cases, with their potential for devastating loss of innocent life."). The maximum possible sentence would also serve the purposes of sentencing because it would "protect the public from further crimes of the defendant." Section 3553(a)(2)(C). The defendant joined ISIS before it declared itself to be a caliphate. He played a key role in building it to the peak of its power as the deadliest terrorist organization in the world. As the trial evidence showed,

time and again, year after year, the defendant reveled in ISIS's gruesome paroxysms of violence and death.

The defendant's starkly different treatment of Jake Bilardi and ████████ ████ prove beyond any shadow of doubt that the defendant will return to supporting radical jihadist violence if given the opportunity. Bilardi was but 17 years of age when he contacted the defendant via Twitter in 2014. Not quite a child anymore; but not yet quite a grown man, either. The defendant was nearly twice Bilardi's age, about to turn 33, and knew how young Bilardi was, and how young he appeared, having met him in person, in Istanbul, in August 2014. The defendant did not care about Bilardi's age. He had no hesitation about launching Bilardi into a warzone. The defendant knew what would happen there: he had been in combat himself, and he celebrated ISIS's savage violence. And when Bilardi blew himself up just nine months later, in Ramadi, Iraq, the defendant took immense personal satisfaction for Bilardi having become a deadly ISIS terrorist. GX 2017B (Mar. 11-12, 2015 Tweets from GreatISNation46 announcing Bilardi's action). Bilardi was 18 years old.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

and about contacting the defendant for help in getting out of Syria. The defendant's response? "[W]hy would you want to come here [to Turkey]? What are you doing here? There's only infidels over here. You should stay where you are." ████████████████████████

████████████████████████

Bilardi's violent death and the violent deaths of his targets were a personal triumph for the defendant. ███████████ ultimate escape was a personal failure for the defendant because it was a failure for ISIS. ███████████ plea for help came six months after Bilardi detonated his suicide bomb. There can be no denying that the defendant had personal, visceral knowledge of what ISIS was likely to do with ███████████ ███████████. The defendant knew what ISIS was. The defendant's callous rejection of ███████████ should therefore be read as "stay there and give your life for ISIS."

There is no reason to conclude that the defendant will ever change. If given the opportunity, he will spend every day that remains to him spending the lives of others in pursuit of jihadist violence. The maximum sentence available is therefore the necessary sentence.

D. The Defendant's History and Characteristics Also Support the Maximum Possible Sentence

The defendant was blessed with the good fortune to survive a war in his childhood and make his way to the United States—what many on the planet would consider having won the life lottery. Rather than continue to build his life here, the defendant abandoned his adoptive country to wage violent *jihad*. His personal history and characteristics, Section 3553(a)(1), outlined in more detail below, therefore also counsel in favor of the maximum possible sentence.

The defendant was born in Pec, Kosovo, in what was then Yugoslavia in 1981. Yugoslavia broke apart as a result of multiple internal and violent armed conflicts in the 1990s, during the defendant's teenage years. Several independent nations emerged as a result, but Kosovo initially remained formally a part of Yugoslavia, of which Serbia formed the dominant

portion. Kosovo came into increasing conflict with the Yugoslav government, and by 1997 an armed resistance to Belgrade had emerged: the Kosovo Liberation Army ("KLA"). See U.S. Dep't of State, "A Guide to the United States' History of Recognition, Diplomatic, and Consular Relations[:] Kosovo."[9] By 1999, after a campaign of "widespread atrocities against civilians" by Yugoslavia's then-leader, Slobodan Milosevic, a UN-authorized NATO peacekeeping force intervened; KLA elements thereafter conducted a reprisal campaign. Id. On February 18, 2008, the United States formally recognized Kosovo as an independent nation. Id.

The defendant survived the Kosovo conflict of his teenage years in the late 1990s, and later succeeded in fleeing Kosovo, arriving in the United States in May 2003. See also PSR ¶¶ 52, 54. ██████████████████████████████████

████████████████████████████████████████

████████████████████████████████████.[10] ████████████████

████████████████████████████████████████

████████████████████. In 2006, the defendant applied for permanent residency, GX 920A, which was later granted. See GX 919A (photograph of the defendant's "Permanent Resident Card").

---

[9] Available at: history.state.gov/countries (access dropdown for "Kosovo") [last accessed May 1, 2023].

[10] In his Probation interview, however, the defendant claimed an "unremarkable childhood" devoid of abuse; as for the Kosovo conflict, the defendant referenced only the "economic challenges" that followed from sanctions. PSR ¶ 52.

In 2011, the defendant applied for U.S. citizenship.  See ███████████████

███████.  The defendant noted that he had been gainfully employed since at least 2008,

variably as a doorman, handyman, and cab driver.  See also PSR ¶ 64.  The defendant was

scheduled to have a citizenship interview on November 20, 2013, but did not appear (as he

was, by then, in Europe en route to Turkey and Syria).  See ████████████████████

███.  His citizenship application was thereafter administratively closed.  Id.

When the defendant's native Kosovo came under attack from Serbia's

strongman Milosevic, the United States and its NATO allies intervened.  ████████████

████████████████████████████████████████████████████████████████

██████████████  When the defendant asked to live in the United States permanently, the

United States said yes.  When the defendant sought work, he found it, in professions that have

served as the launchpad for generations of immigrant families that are the lifeblood of this city

and country.

Many would view the defendant's personal history between 1999 and 2013 as a

series of windfalls.  But the defendant has squandered these advantages, greeting with them

contempt and disdain.  He traded his adopted home for war, blood, and death.  The Court can

and should consider these aspects of the defendant's history and characteristics at sentencing,

and should conclude that they merit the maximum sentence available.

E.    Supervised Release

The defendant's convictions under 18 U.S.C. § 2339B are terrorism predicates

for purposes of supervised release, enlarging the authorized supervise release term to life.  See

18 U.S.C. §§ 2332b(g)(5)(B), 3583(j); cf. PSR ¶¶ 72-74.  Although the government believes

that any term of supervised release will be mooted in light of the defendant's term of

incarceration, the government respectfully requests that the Court impose a term of supervised release of life.

F.      Financial Aspects of Sentencing

The Court is required to impose a special assessment of $600. PSR ¶ 78; 18 U.S.C. § 3013.

The defendant refused to provide Probation with a signed release form to obtain financial records, so a full picture of his financial status is not available. Nonetheless, the government has no reason to doubt that the defendant appears unable to pay a fine. PSR ¶ 69.

The government has not received any requests for restitution. See PSR ¶ 29.

<u>CONCLUSION</u>

For the reasons set forth above, the government respectfully requests that the

Court impose a sentence of life imprisonment as to Counts One and Five, running

concurrently as to each other, to be followed consecutively by a maximum term of twenty

years as to each of Counts Two, Three, Four and Six, for an effective sentence of life plus

eighty years, to be followed by a supervised release term of life.

Dated:     Brooklyn, New York
           June 30, 2023

                                Respectfully submitted,

                                BREON PEACE
                                UNITED STATES ATTORNEY
                                Eastern District of New York

            By:                                
                                Saritha Komatireddy
                                J. Matthew Haggans
                                Assistant United States Attorneys
                                (718) 254-7000

Cc:    Clerk of Court (NGG) (By Email and ECF)
       Robert Soloway & David Stern, Esqs. (By Email and ECF)
       U.S. Probation Officer Jennifer E. Baumann (By Email)